# Illinois Official Reports

## Supreme Court

***People v. Murray*, 2019 IL 123289**

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DEONTAE X. MURRAY, Appellant. |
| Docket No. | 123289 |
| Filed | October 18, 2019 |
| Decision Under Review | Appeal from the Appellate Court for the Second District; heard in that court on appeal from the Circuit Court of Boone County, the Hon. C. Robert Tobin III, Judge, presiding. |
| Judgment | Appellate court judgment reversed.<br>Circuit court judgment reversed in part and remanded with directions. |
| Counsel on Appeal | James E. Chadd, State Appellate Defender, Patricia Mysza, Deputy Defender, and Jennifer L. Bontrager, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellant.<br><br>Lisa Madigan, Attorney General, of Springfield (David L. Franklin, Solicitor General, and Michael M. Glick and Jason F. Krigel, Assistant Attorneys General, of Chicago, of counsel), for the People. |

Justices               JUSTICE NEVILLE delivered the judgment of the court.

Justice Burke concurred in the judgment and opinion.

Justice Kilbride specially concurred, with opinion, joined by Chief Justice Karmeier.

Justice Garman dissented, with opinion, joined by Justices Thomas and Theis.

**OPINION**

¶ 1        Following a jury trial, defendant Deontae X. Murray was convicted of first degree murder (720 ILCS 5/9-1(a)(2) (West 2012)) and unlawful possession of a firearm by a street gang member (*id.* § 24-1.8(a)(1)). The circuit court of Boone County sentenced defendant to consecutive terms of 50 years and 10 years respectively. On appeal, defendant argued that the evidence was insufficient to establish that he committed the firearm offense. The appellate court affirmed defendant's conviction. 2017 IL App (2d) 150599. We allowed defendant's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Nov. 1, 2017). For the reasons that follow, we reverse the judgment of the appellate court.

¶ 2                        I. BACKGROUND

¶ 3        The evidence presented at trial established the following relevant facts. On April 21, 2013, defendant went to a gas station in Belvidere, Illinois, to purchase beer. Defendant was accompanied by Marco Hernandez. As defendant and Hernandez were exiting the gas station store, Max Cox and Richard Herman were entering. Cox had admitted belonging to the Sureño 13 street gang.

¶ 4        Defendant and Hernandez waited outside until Cox and Herman eventually exited the gas station store and walked back to their car, which was parked by a gas pump. Defendant and Hernandez approached Cox and Herman. Defendant asked Cox "what's up" and whether he was "gang banging." Cox replied "no," and defendant lifted up his shirt to reveal a handgun and accused Cox of lying. According to Cox, Hernandez, who had been standing in front of defendant, removed the handgun from defendant's waist band, stepped away, and then held it behind his own back. Hernandez and Herman began to argue, and Cox told Herman to "[s]hut the f*** up, he has a gun." Hernandez pulled out the gun, ran up to Herman, and shot him in the chest. Herman was taken to a nearby hospital, where he was pronounced dead.

¶ 5        A grand jury indicted defendant and Hernandez in connection with Herman's murder. Defendant was charged with first degree murder (720 ILCS 5/9-1(a)(2) (West 2012)), aggravated unlawful use of a weapon (*id.* § 24-1.6(a)(1), (a)(3)(A), (d)), and unlawful possession of a firearm by a street gang member (*id.* § 24-1.8(a)(1)).

¶ 6        At defendant's trial, the State called police detective David Dammon as a witness. Dammon testified about his experience with the Belvidere Police Department beginning in 1996, his position in the street gang unit, and his specialized training and courses taken in street gangs and gang activity, which included training dealing with active gangs in Chicago, the Chicago suburbs, and areas close to Belvidere and Rockford. Dammon also testified that he

had been personally involved in over 400 gang crime investigations and that, while acting as a gang officer and detective, he had contact with gang members in Belvidere well over a thousand times and personally interviewed people taken into custody for various gang offenses well over a thousand times.

¶ 7    In addition, Dammon generally described how street gangs operate, their hierarchy, and their use of guns for the protection of drugs, cash, and themselves from rival gangs. He testified that the Latin Kings and the Sureño 13s are the major groups of gangs in the Belvidere area and that there is a rivalry between them. He also testified that the phrase "*gang banging*" indicates when gang members are doing gang work, are intimidating people, and are committing crimes for the benefit of a street gang. He further testified that he had contact with defendant in the context of prior gang investigations.

¶ 8    Over an objection made by defendant, Dammon was permitted to testify as an expert on gang activity. The following testimony was elicited on the State's direct examination of Dammon:

"Q. What is a street gang?

A. A street gang is defined by Illinois statute actually. It has to have one of three things. It's two or more people with a recognized hierarchy and leader and their activities are criminal or at least a threat to society.

Q. Is the Latin Kings [a] street gang, is that an organized street gang as defined by our state Street Gang Omnibus Act?

A. It is."

¶ 9    Dammon stated that, as a member of the street gang unit, he gathers intelligence information from and for street gang databases. He also testified to specific types of sources that he and other experts in their field rely upon in identifying someone as a gang member, including law enforcement databases.

¶ 10    During Dammon's testimony, the State played for the jury two videos recovered from defendant's cell phone recorded two hours prior to the shooting. The videos show defendant and Anthony Perez outside an apartment complex in Belvidere, standing in front of graffiti, making hand signals. In one video, Perez is seen urinating on the side of the building, walking over to the graffiti, and saying aloud "thirteen K." Dammon explained that the "13" stands for the Sureño 13 gang and the K was added to signify a Sureño 13 killer. Dammon testified that the graffiti is "something that somebody that didn't get along with the 13's would put up."

¶ 11    Defendant also testified. He stated that he had been a member of the Latin Kings from the age of 13 to 21 but, at the time of trial, he was no longer a member.

¶ 12    The jury convicted defendant of all three offenses, and the circuit court merged the aggravated unlawful use of a weapon conviction (*id.* § 24-1.6(a)(1), (a)(3)(A), (d)) into the unlawful possession of a firearm by a street gang member conviction (*id.* § 24-1.8(a)(1)) and imposed a sentence on that offense. Defendant appealed.

¶ 13    On appeal, defendant raised several issues. Relevant here, defendant asserted that the State failed to prove that the Latin Kings are a "streetgang" as defined by the Illinois Streetgang Terrorism Omnibus Prevention Act (Act). 740 ILCS 147/10 (West 2012); see 720 ILCS 5/24-1.8(a)(1) (West 2012) (unlawful possession of a firearm by a street gang member statute providing that the term "street gang" has the meaning ascribed to it by the Act); 740 ILCS

147/10 (West 2012) (defining "streetgang," including the term "course or pattern of criminal activity," which is itself separately defined).

¶ 14    Defendant contended that, as in *People v. Lozano*, 2017 IL App (1st) 142723, he could not be guilty of unlawful possession of a firearm by a street gang member because the State did not establish, by way of Dammon's testimony, that the Latin Kings committed certain crimes within the relevant time period. Thus, because the State did not show that the Latin Kings had engaged in a "course or pattern of criminal activity" during the requisite time period, the State failed to prove that the Latin Kings are a "street gang."

¶ 15    The appellate court rejected defendant's argument, concluding:

> "[I]n *People v. Jamesson*, 329 Ill. App. 3d 446, 460 (2002), this court held that an expert on gangs may opine on the ultimate issue of whether an organization is a street gang engaged in a course or pattern of criminal activity without testifying to specific dates or incidents. Here, Dammon testified to the organizational structure of street gangs in general, and the Latin Kings in particular, and he opined that the Latin Kings are a street gang within the meaning of Illinois law. That opinion alone was sufficient to establish the element that the Latin Kings are a street gang. Further, Dammon testified in the present tense that gangs use guns to protect their drugs, cash, and members from rival gangs and that members do whatever is needed to benefit the gang, including intimidation of people. We believe that the jury could have reasonably inferred from Dammon's testimony that the Latin Kings historically and currently commit felonies." 2017 IL App (2d) 150599, ¶ 83.

¶ 16                                    II. ANALYSIS

¶ 17    Before this court, defendant argues that the State failed to prove that the Latin Kings are a "street gang" as defined by the Act. See 740 ILCS 147/10 (West 2012). Specifically, defendant contends that the State's proof was insufficient because its gang expert did not testify to a relevant time period or, indeed, to any specific historical crimes committed by the Latin Kings, as required by the Act.

¶ 18    The State maintains it is not required to present evidence of specific crimes committed by the Latin Kings. The State asserts that, because an expert may provide an opinion on the ultimate issue in a case, Dammon's testimony was sufficient to establish that the Latin Kings are a "street gang," as defined by the Act. The State alternatively contends that, if proof of specific crimes were required, it presented evidence of a "course or pattern of criminal activity" through defendant's own crimes.

¶ 19    Where a criminal conviction is challenged based on insufficient evidence, a reviewing court, considering all of the evidence in the light most favorable to the prosecution, must determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *People v. Brown*, 2013 IL 114196, ¶ 48; *People v. Cooper*, 194 Ill. 2d 419, 430-31 (2000). This standard of review "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; accord *People v. Howery*, 178 Ill. 2d 1, 38 (1997). Therefore, a reviewing court will not substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of the witnesses. *Brown*, 2013 IL

114196, ¶ 48; *Cooper*, 194 Ill. 2d at 431. Although these determinations by the trier of fact are entitled to deference, they are not conclusive. Rather, a criminal conviction will be reversed where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. *Brown*, 2013 IL 114196, ¶ 48; *People v. Wheeler*, 226 Ill. 2d 92, 115 (2007); *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001).

¶ 20                                    A. Expert Opinion

¶ 21       We begin by considering defendant's assertion that Dammon's testimony was insufficient to establish that the Latin Kings are a street gang as defined by the Act. The State counters that it is not required to present evidence of specific crimes committed by the Latin Kings. We agree with defendant.

¶ 22       In the case at bar, the offense of unlawful possession of a firearm by a street gang member (720 ILCS 5/24-1.8(a)(1) (West 2012)) requires proof that the Latin Kings are a "streetgang" as defined in section 10 of the Act. The Act defines "streetgang" as "any combination *** of 3 or more persons with an established hierarchy that, through its membership or through the agency of any member engages in a course or pattern of criminal activity." 740 ILCS 147/10 (West 2012).

¶ 23       "Course or pattern of criminal activity" is defined, in part, as (1) two or more gang-related criminal offenses committed in whole or in part within this State; (2) that at least one such offense was committed after January 1, 1993, the effective date of the Act; (3) that both offenses were committed within five years of each other; and (4) that at least one offense involved the solicitation to commit, conspiracy to commit, attempt to commit, or commission of any offense defined as a felony or forcible felony under the Criminal Code of 2012. *Id.*

¶ 24       The offense of unlawful possession of a firearm by a street gang member incorporates by reference the definition of a "streetgang" as set forth in the Act. The effect of this reference is the same as though these provisions had been incorporated into the adopting statute. See *People v. Lewis*, 5 Ill. 2d 117, 122 (1955) (finding it is a familiar legislative process to incorporate one statute into another by reference); *In re Jarquan B.*, 2017 IL 121483, ¶ 61 (Burke, J., specially concurring, joined by Kilbride, J.). The incorporation of the definition of a "streetgang" into the terms of the offense signifies that the requirements in the Act are elements of the offense. *Lewis*, 5 Ill. 2d at 122. Thus, in addition to possessing a gun and being a member of a gang, proof of defendant's guilt of the offense mandates that the State present evidence that establishes a "course or pattern of criminal activity" (1) that the Latin Kings were involved in two or more gang-related criminal offenses; (2) that at least one such offense was committed after January 1, 1993; (3) that both offenses were committed within five years of each other; and (4) that at least one offense involved the solicitation to commit, conspiracy to commit, attempt to commit, or commission of any offense defined as a felony or forcible felony. 740 ILCS 147/10 (West 2012).

¶ 25       Briefly summarized, Dammon's relevant testimony established that, since 1996, he had been a member of the Belvidere Police Department's street gang unit with specialized training. As a member of that unit, his responsibilities included investigations and interviews with gang members and enforcing laws for crimes that are being committed by gang members. He also testified to his expertise with gangs in general and familiarity not only with the local Latin Kings but with defendant himself.

¶ 26    Furthermore, Dammon was shown data sheets from the Belvidere Police Department's gang database and explained that such documents are one type of evidence upon which gang experts rely to identify someone as a gang member. When asked about other evidence experts in his field rely upon, Dammon identified the Law Enforcement Automated Data System (LEADS), the Illinois Department of Corrections Information System, previous narcotics cases, notes from such cases, and notes from interviewing other gang members or persons who are affiliated with gangs that have previously given reliable and reputable information. Finally, Dammon stated that the Latin Kings are a street gang as defined by the Act.

¶ 27    The State maintains that Dammon's opinion that the Latin Kings are a "street gang" was sufficient, even though his direct testimony did not disclose any specific crime evidence. The State asserts that, once Dammon provided his expert opinion on the street gang element, the burden shifted to defendant to cross-examine Dammon on the facts underlying that opinion. That approach, however, erroneously shifts the burden of proof and requires defendant to disprove the State's case before it has established the elements of the offense of unlawful possession of a firearm by a street gang member.

¶ 28    The right to due process, as guaranteed by the United States and Illinois Constitutions (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2), safeguards an accused from conviction except upon proof beyond a reasonable doubt of every fact necessary to prove each element that constitutes the crime charged. See *Jackson*, 443 U.S. at 315-16; *Brown*, 2013 IL 114196, ¶ 48; *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004). An essential element of proof to sustain a conviction cannot be inferred but must be established. *People v. Mosby*, 25 Ill. 2d 400, 403 (1962). It is axiomatic that the State carries the burden of proving each element of a charged offense beyond a reasonable doubt. *Brown*, 2013 IL 114196, ¶ 52. Such burden rests on the State throughout the entire trial and never shifts to the defendant. *Howery*, 178 Ill. 2d at 32. Therefore, the defendant is under no obligation to produce any evidence, and the burden of proof never shifts to the defendant but remains the responsibility of the State throughout the trial. *People v. Weinstein*, 35 Ill. 2d 467, 470 (1966); *People v. Kelley*, 2015 IL App (1st) 132782, ¶ 62.

¶ 29    The State concedes, as it must, that Dammon's direct testimony did not disclose the specific crime evidence required by the Act. Further, the State finds it significant that defendant did not cross-examine Dammon regarding his opinion.

¶ 30    The State's attempt to shift the burden of proof to defendant, excusing it from being required to prove the elements of the charged offense, violates defendant's right to due process. See *Jackson*, 443 U.S. at 315-16. In general, the purpose of cross-examination is to highlight the flaws and omissions in the evidence presented during direct examination. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 105 (1995). As a practical matter, cross-examination is necessary only where the flaws and omissions are not readily apparent from the previous testimony on direct examination. In a criminal case, cross-examination of the State's witnesses is not intended to serve as an alternative means of establishing the elements of the offense beyond a reasonable doubt. *Mosby*, 25 Ill. 2d at 403. If the State fails to present evidence that establishes the elements of the charged offense, cross-examination by the defendant is not required. *Howery*, 178 Ill. 2d at 32. Because the State bears the burden of proof, it similarly bears the consequences of any omission of proof.

¶ 31    In addition, we observe that Illinois Rule of Evidence 705 (eff. Jan. 1, 2011) unambiguously requires that Dammon articulate the reasons for his opinion. Rule 705 provides that "[t]he expert may testify in terms of opinion or inference and give reasons therefore without first testifying to the underlying facts or data." *Id.* Here, Dammon generally described in broad terms the types of information and facts on which his opinion was based, but he never explained his reasons as to why that information supported his opinion. Admittedly, Dammon was not obligated to bring forth the underlying facts and data upon which his opinion was premised, but merely identifying the source of those facts and data, without explaining the reasons for his opinion, fails to prove the elements of the offense of unlawful possession of a firearm by a street gang member.

¶ 32    In contrast to the State's approach in this case, the correct application of Rule 705 is illustrated by *People v. Fountain*, 2016 IL App (1st) 131474, *People v. Simpson*, 2015 IL App (1st) 130303, and *People v. Negron*, 2012 IL App (1st) 101194. In each of these cases, all of the requirements of Rule 705 have been satisfied. Although these cases are based on the admissibility of the evidence, rather than the sufficiency of the evidence, we find the reasoning instructive regarding the interplay of Rule 705 and presentation of expert testimony in a criminal case.

¶ 33    In the aforementioned cases, the appellate court noted that the experts testified on an ultimate issue or conclusion, detailed their analytic process and methodology, and also thoroughly explained the reasons for their opinions. *Fountain*, 2016 IL App (1st) 131474, ¶¶ 65-67; *Simpson*, 2015 IL App (1st) 130303, ¶¶ 14, 38; *Negron*, 2012 IL App (1st) 101194, ¶¶ 38, 40. In each case, the appellate court acknowledged that Rule 705 permits an expert to testify in terms of opinion or inference and to give reasons therefor without divulging the underlying facts and data for it, which then shifts the burden to the opposing party to explore the same on cross-examination. *Fountain*, 2016 IL App (1st) 131474, ¶ 64 (applying Illinois Rule of Evidence 705 (eff. Jan. 1, 2011)); *Simpson*, 2015 IL App (1st) 130303, ¶ 37 (same); *Negron*, 2012 IL App (1st) 101194, ¶ 42 (same). However, in all of these cases, the defense engaged in rigorous cross-examination eliciting the flaws and omissions in the experts' reasons *only after* the experts' direct testimony fully explained the reasons and basis for their opinions. *Fountain*, 2016 IL App (1st) 131474, ¶ 68; *Simpson*, 2015 IL App (1st) 130303, ¶ 38; *Negron*, 2012 IL App (1st) 101194, ¶ 42.

¶ 34    This case presents a distinctly different circumstance. Here, the State never satisfied the first condition of Rule 705, which requires testimony explaining the reasons for the expert's opinion. Ill. R. Evid. 705 (eff. Jan. 1, 2011); see *People v. Mpulamasaka*, 2016 IL App (2d) 130703, ¶ 89 (an expert's opinion is only as valid as the reasons for the opinion). This condition must be fulfilled prior to shifting the burden to defendant to explore the underlying facts or data on cross-examination. Dammon only provided a general reference to the sources of the underlying facts and data. He never explained the nexus between (1) LEADS, the Illinois Department of Corrections Information System, gang databases, or notes from other cases and (2) how this information established that the Latin Kings were a street gang engaged in a "course or pattern of criminal activity." He described the nature of his experience and familiarity with the databases, but he never explained the reasons or information and facts that supported his opinion, and he never connected his reasons or the information and facts to defendant to satisfy the statutory definition of "street gang." The State also failed to meet its burden because it failed to present evidence that established two specific crimes, one of which

- 7 -

must involve the solicitation to commit, conspiracy to commit, attempt to commit, or commission of any offense defined as a felony or forcible felony under the Criminal Code of 2012, within the relevant time period. 740 ILCS 147/10 (West 2012). Therefore, because Dammon's direct testimony was devoid of any "course or pattern of criminal activity" evidence, the offense of unlawful possession of a firearm by a street gang member had not been established, and cross-examination by defendant was not required.

¶ 35    Further, we note that, with regard to Dammon's reliance on gang databases for his opinion, Illinois Rule of Evidence 803(8) (eff. Apr. 26, 2012) provides, in relevant part:

> "The following are not excluded by the hearsay rule ***:
>
> *** Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report *** unless the sources of information or other circumstances indicate lack of trustworthiness."

Pursuant to Illinois Rule of Evidence 201, we take judicial notice of the fact that the City of Chicago inspector general's April 2019 review of the Chicago Police Department's "Gang Database" found that the Chicago Police Department (CPD) lacks sufficient controls for generating, maintaining, and sharing gang-related data; CPD's gang information practices lack procedural fairness protections; CPD's gang designations raise significant quality concerns; and CPD's practices and lack of transparency regarding its gang designations strain police-community relations, indicating that the gang database lacks trustworthiness. See Ill. R. Evid. 201(b) (eff. Jan. 1, 2011) ("A judicially noticed fact must be one not subject to reasonable dispute in that it is *** capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."); Ill. R. Evid. 201(c) (eff. Jan. 1, 2011) ("A court may take judicial notice, whether requested or not."); see also Office of Inspector General, City of Chicago, *Review of the Chicago Police Department's "Gang Database"* (Apr. 11, 2019), https://igchicago.org/2019/04/11/review-of-the-chicago-police-departments-gang-database [https://perma.cc/85VR-5YKN].

¶ 36    Here, we find that the State presented no evidence of the Latin Kings' involvement in specific crimes as required by the Act. See 740 ILCS 147/10 (West 2012). Dammon did not identify the Latin Kings' commission of particular offenses on certain dates. Furthermore, the State provided no other witnesses who testified to specific offenses committed by the Latin Kings during the relevant time period that would satisfy the statutory definition of a "streetgang." Expert opinions and inferences testified to under Rule 705, without testimony regarding specific crimes committed by the Latin Kings, do not establish a violation of the Act. As stated earlier, an essential element of proof to sustain a conviction cannot be inferred but must be established. *Mosby*, 25 Ill. 2d at 403.

¶ 37    The State's approach in this case violated the constitution because it shifted the burden to defendant to disprove an element of the offense. See *Brown*, 2013 IL 114196, ¶ 52 (holding the State always has the burden of proving all of the elements of the offense); *Howery*, 178 Ill. 2d at 32 (burden rests on the State throughout the entire trial and never shifts to the defendant). Thus, under the circumstances here, we find that the State failed to meet its burden of presenting evidence that established that the Latin Kings meet the statutory definition of a "streetgang." See *Patterson v. New York*, 432 U.S. 197, 210 (1977) (holding that "the Due

Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which the defendant is charged").

¶ 38    Finally, having examined the appellate court opinions that excused the State from proving all the elements of the offense of unlawful possession of a firearm by a street gang member, we observe that these decisions are in direct contravention of the express language in the Act. The Act requires that at least one of the two required offenses be committed after January 1, 1993, and that the offenses had been committed within five years of each other. 740 ILCS 147/10 (West 2012). The primary objective in construing a statute is to ascertain and give effect to the intent of the legislature. *People v. Casas*, 2017 IL 120797, ¶ 18. The most reliable indicator of legislative intent is the language of the statute, given its plain and ordinary meaning. *People v. Reese*, 2017 IL 120011, ¶ 30.

¶ 39    The language of the Act definitively implements the legislative intent. During Senate debate on creating the offense at issue here, lawmakers expressed concern about the possibility of unfairly punishing individuals based on prior or tenuous gang affiliation. 96th Ill. Gen. Assem., Senate Proceedings, Oct. 29, 2009, at 154-55 (statements of Senator Raoul). Further, there was an inquiry as to whether the statute contained a "very clear definition of what a gang member is." *Id.* at 157 (statements of Senator Rutherford). In response, Senator Millner stated that the defendant must be "actively engaged in the criminal enterprise" and "the burden of proof from the State's attorney's office *** has to be very, very high. They have to prove it up. And *** it has to be part of the Illinois Streetgang Terroris[m] Omnibus [Prevention] Act." *Id.* at 158 (statements of Senator Millner). He stated that the definition is "probably two hundred plus words defining what a street gang member is and what it takes to be actively engaged in a criminal enterprise," again reiterating that "the burden of proof is very high." *Id.* at 158-59 (statements of Senator Millner).

¶ 40    Turning to the appellate decisions, in *People v. Jamesson*, the court noted that the detective's testimony specified that he began having contact with the street gang " 'a couple of years ago' " and the street gang was involved with aggravated batteries. *People v. Jamesson*, 329 Ill. App. 3d 446, 460-61 (2002). The court concluded that the reference to "a couple of years ago" was adequate to establish that the offenses occurred within five years of each other and took place after the effective date of the Act, thus satisfying the elements of being a "street gang." *Id.* at 461.

¶ 41    In a more recent appellate opinion, *People v. Berrios*, 2018 IL App (2d) 150824, the court, relying on *Jamesson* and the appellate court's decision in this case, reasoned that it had " 'previously held that an expert on gangs may opine on the ultimate issue of whether an organization is a street gang engaged in a course or pattern of criminal activity without testifying to specific dates or incidents.' " *Id.* ¶ 22 (quoting *People v. Murray*, 2017 IL App (2d) 150599, ¶ 83). The *Berrios* court observed that the expert testified that he had been with the gang unit for three years and that the gang unit " 'track[s]' " the Latin Kings and other street gangs. *Id.* In so stating, the court determined that the expert had expressed his opinion that the Latin Kings are, in fact, a street gang. *Id.* The court stated that under our precedents nothing more was required. *Id.* The *Berrios* court acknowledged that the expert's testimony concerning the Latin Kings could have been more comprehensive. *Id.* However, the court found that the evidence was sufficient to support a reasonable determination that the Latin

Kings are a street gang having engaged in a course or pattern of criminal activity within the meaning of section 10 of the Act. *Id.*

¶ 42    It is apparent that some appellate court decisions, relying on the appellate court's decision in this case and *Jamesson*, now require *no testimony* on "course or pattern of criminal activity" establishing (1) that a street gang was involved in two or more gang-related criminal offenses; (2) that at least one such offense was committed after January 1, 1993; (3) that both offenses were committed within five years of each other; and (4) that at least one offense involved the solicitation to commit, conspiracy to commit, attempt to commit, or commission of any offense defined as a felony or forcible felony. 740 ILCS 147/10 (West 2012). It is also clear from the legislative history that the legislature intended to hold the State to a "very, very high" burden when establishing each and every element of the offense, including the definition of "streetgang," which requires proof of "a course or pattern of criminal activity." See 96th Ill. Gen. Assem., Oct. 29, 2009, at 158 (statements of Senator Millner); 740 ILCS 147/10 (West 2012). The current trend in the appellate court of excusing proof of each element of the offense is in direct conflict with our precedents and the language of the Act. *Brown*, 2013 IL 114196, ¶ 52; *Howery*, 178 Ill. 2d at 32; *Mosby*, 25 Ill. 2d at 403; 740 ILCS 147/10 (West 2012). Therefore, it cannot be said that proof of specific crimes is not required. Accordingly, to the extent that *Jamesson* and *Berrios* stated otherwise, they are overruled.

¶ 43    In support of its assertion that evidence of specific crimes committed by the Latin Kings is not required, the State relies on *People v. Wright*, 2017 IL 119561. The State maintains that, as in *Wright*, it is not constrained by the statutory requirements regarding the proof necessary to establish an element of defendant's offense. We find, however, that this case does not establish an exemption from proving statutory requirements.

¶ 44    In *Wright*, the State had to prove that the defendant or someone he was accountable for was armed with a firearm as defined by statute, which defined a firearm, in pertinent part, as " 'any device, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas or escape of gas' but specifically excluding, among other items, any pneumatic gun, spring gun, paint ball gun, or BB gun." *Id.* ¶ 71 (quoting 430 ILCS 65/1.1 (West 2012)). The court held that the jury was entitled to believe the testimony of three lay witnesses who observed "a semiautomatic," "an 'actual firearm,' " "the handle of a gun in the waistband of his pants," and "a 9 millimeter pistol." *Id.* ¶ 76. The testimony was sufficient to find the codefendant was armed with a firearm during the commission of the robbery, and thus, defendant was guilty beyond a reasonable doubt. *Id.* ¶ 77. The State observes that, in *Wright*, it was not required to present evidence that the firearm used in the crime met the technical statutory definition of a firearm in all respects. The State contends that, as in *Wright*, it should not be required to prove its case with a particular type of evidence.

¶ 45    We find this argument unavailing, as *Wright* is clearly distinguishable. In *Wright*, there were three eyewitnesses testifying to characteristics of a physical object. *Id.* ¶ 76. By contrast, in the case at bar, a street gang as defined by the Act requires proof of each element codified in the statute, but there was no witness testimony providing evidence to prove the Latin Kings meet the statutory definition of a street gang. Accordingly, we reject the State's assertion that *Wright* supports the argument that it is not required to present evidence of specific crimes committed by the Latin Kings in the relevant time period.

## B. Defendant's Own Crimes

¶ 47    The State alternatively contends that, if proof of specific crimes were required, it presented evidence of a "course or pattern of criminal activity" through defendant's own crimes. The State maintains that the jury heard evidence of two or more "gang-related" offenses occurring on the day of the murder. The State relies on defendant's convictions for first degree murder and aggravated unlawful use of a weapon, maintaining that the crimes were "gang-related" as defined by the Act. 740 ILCS 147/10 (West 2012).

¶ 48    The Act provides that "gang-related" means any criminal activity directed by any gang leader or authority with the intent to (1) increase the gang's size, membership, prestige, dominance, or control in any geographical area or (2) provide the gang with any advantage in a criminal market sector or (3) exact revenge or retribution for the gang or (4) obstruct justice or (5) benefit the gang. *Id.*

¶ 49    The State's contention, that reference to defendant's own criminal behavior on the day of the shooting as "gang-related" and to defendant's alleged criminal behavior is sufficient to prove that the Latin Kings are a street gang, is without merit. At the time the evidence was presented to the jury, defendant was only charged with the crimes; there had yet to be any determination whether defendant committed the offenses as charged or that they related in any way to the Latin Kings. Further, the alleged crimes of which defendant was charged and ultimately convicted cannot serve as evidence to establish an element of one of those charged crimes. Consequently, we reject the State's contention that, at the time of trial, these charged crimes were sufficient to establish a "course or pattern of criminal activity" as defined by the Act. See *id.*; *Mosby*, 25 Ill. 2d at 403.

¶ 50    The State also argues that it established a "course or pattern of criminal activity" by presenting evidence of "one or more acts of criminal defacement of property under section 21-1.3 of the Criminal Code of 2012, if the defacement includes a sign or other symbol intended to identify the streetgang." See 720 ILCS 5/21-1.3 (West 2012); 740 ILCS 147/10 (West 2012). The State contends that, after viewing defendant's cell phone videos, the jury could have inferred that defendant and Perez created the graffiti.

¶ 51    Again, we find this argument to be without merit. The State did not prove "one or more acts of criminal defacement of property" when it failed to present a witness who testified as to who created the graffiti or when it was created. When the State's witnesses failed to testify that they were present when the property was defaced, the jury had no evidence from which it could infer that the defendant defaced the property. In addition, because a "course or pattern of criminal activity" is an element of the offense, which must be established and cannot be proved by inference (*Mosby*, 25 Ill. 2d at 403), the evidence was insufficient to prove defendant guilty of the offense. Accordingly, the State failed to meet its burden of proving that the Latin Kings meet the statutory definition of a "street gang."

## III. CONCLUSION

¶ 53    In conclusion, when we consider the evidence in the light most favorable to the State, we find that the State did not present evidence that established the elements codified in the statute. At trial, there was no "course or pattern of criminal activity" testimony (1) that the Latin Kings were involved in two or more gang-related criminal offenses; (2) that at least one such offense was committed after January 1, 1993; (3) that both offenses were committed within five years

of each other; and (4) that at least one offense involved the solicitation to commit, conspiracy to commit, attempt to commit, or commission of any offense defined as a felony or forcible felony. 740 ILCS 147/10 (West 2012). Consequently, we hold that the State failed to prove that the Latin Kings were a street gang, as defined by the Act. Defendant's conviction and sentence for unlawful possession of a firearm by a street gang member are vacated. For the foregoing reasons we reverse that portion of the judgment of the appellate court affirming defendant's conviction for that offense and remand to the circuit court for sentencing on the conviction for aggravated unlawful use of a weapon. 720 ILCS 5/24-1.8(a)(1) (West 2012); *id.* § 24-1.6(a)(1), (a)(3)(A), (d).

¶ 54        Appellate court judgment reversed.

¶ 55        Circuit court judgment reversed in part and remanded with directions.

¶ 56        JUSTICE KILBRIDE, specially concurring:

¶ 57        I agree with the result and most of the majority's analysis, but I do not join its discussion of Illinois Rule of Evidence 705 (eff. Jan. 1, 2011), concluding that the rule "unambiguously requires that [Detective] Dammon articulate the reasons for his opinion." See *supra* ¶ 31. That discussion creates unnecessary tension between this decision and our long-standing rule in *Wilson v. Clark*, 84 Ill. 2d 186 (1981). I believe the State's failure to establish a *prima facie* case on the count charging defendant with the unlawful possession of a firearm as a street gang member negates any need to address either Rule 705 or *Wilson*.

¶ 58        In *Wilson*, we adopted Federal Rules of Evidence 703 and 705 and, as our subsequent case law explains, declared

> "that, at trial, 'an expert may give an opinion without disclosing the facts underlying that opinion.' *Wilson*, 84 Ill. 2d at 194. 'Under Rule 705 the burden is placed upon the adverse party during cross-examination to elicit the facts underlying the expert opinion.' *Wilson*, 84 Ill. 2d at 194. Thus, an expert testifying at trial may offer an opinion based on facts not in evidence, and the expert is not required on direct examination to disclose the facts underlying the expert's opinion. *Robidoux v. Oliphant*, 201 Ill. 2d 324, 334 (2002)." *People v. Williams*, 238 Ill. 2d 125, 137 (2010), *aff'd*, 567 U.S. 50 (2012).

In contrast, the majority here concludes that Rule 705 "unambiguously requires" experts to explain the reasons underlying their opinions, creating tension with our long-standing statements in *Wilson* and its progeny, but does not harmonize the two views.

¶ 59        For its part, the dissent maintains that, under *Wilson*, Dammon's expert opinion was "proper" (*infra* ¶ 86) and could permissibly be based on facts that are not substantive evidence (*infra* ¶ 81). While I do not disagree with those statements, I believe they miss the point. The critical question here is not the propriety of admitting the expert testimony but whether that testimony is sufficient to establish part of the State's *prima facie* case.

¶ 60        In my view, we need not consider how, or even if, Rule 705 and *Wilson* apply. This court adheres to the principle of party presentation, acting as a neutral arbiter of issues that have been framed by the parties to the controversy. That principle is grounded in the sound rationale that, in our adversarial system of justice, " 'the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief.' *** 'Counsel

- 12 -

almost always know a great deal more about their cases than we do.' " *Greenlaw v. United States*, 554 U.S. 237, 244 (2008) (quoting *Castro v. United States*, 540 U.S. 375, 386 (Scalia, J., concurring in part and concurring in the judgment, joined by Thomas, J.), and *United States v. Samuels*, 808 F.2d 1298, 1301 (8th Cir. 1987) (Arnold, J., concurring in the denial of rehearing *en banc*)).

> " 'Were we to address these unbriefed issues, we would be forced to speculate as to the arguments that the parties might have presented had these issues been properly raised before this court. To engage in such speculation would only cause further injustice; thus we refrain from addressing these issues *sua sponte*.' " *People v. Givens*, 237 Ill. 2d 311, 324 (2010) (quoting *People v. Rodriguez*, 336 Ill. App. 3d 1, 14 (2002)).

Here, the parties' briefs did not even mention Rule 705 or *Wilson*. That absence of any written argument strongly suggests that the parties believe their consideration is unnecessary for a proper resolution of this appeal, and I agree.

¶ 61 Nonetheless, after reviewing the record, I conclude that the State failed to offer up sufficient evidence to make its *prima facie* case. Its reliance on Detective Dammon's testimony failed to establish critical parts of the State's *prima facie* case by providing some evidence that the Latin Kings met the *statutory definition* of a "street gang" expressly incorporated into the charged offense. As defined by our legislature, the offense of unlawful possession of a firearm by a street gang member requires the State to prove beyond a reasonable doubt that the defendant knowingly:

> "(1) possesses, carries, or conceals on or about his or her person a firearm and firearm ammunition while on any street, road, alley, gangway, sidewalk, or any other lands *** and has not been issued a currently valid Firearm Owner's Identification Card and is a member of a street gang[.] ***
>
> * * *
>
> (c) For purposes of this Section:
>
>> 'Street gang' or 'gang' has the meaning ascribed to it in Section 10 of the Illinois Streetgang Terrorism Omnibus Prevention Act [(Streetgang Act) (740 ILCS 147/1 *et seq.* (West 2012))]." 720 ILCS 5/24-1.8(a)(1), (c) (West 2012).

¶ 62 The definition statutorily ascribed to "street gang" in the Streetgang Act states that the term "means any combination, confederation, alliance, network, conspiracy, understanding, or other similar conjoining, in law or in fact, of 3 or more persons with an established hierarchy that, through its membership or through the agency of any member engages in a *course or pattern of criminal activity*." (Emphasis added.) 740 ILCS 147/10 (West 2012). In turn, the Streetgang Act defines a "course or pattern of criminal activity," the key language in this controversy, as

> "2 or more gang-related criminal offenses committed in whole or in part within this State when:
>
>> (1) at least one such offense was committed after the effective date of this Act;
>>
>> (2) both offenses were committed within 5 years of each other; and
>>
>> (3) at least one offense involved *** any offense defined as a felony or forcible felony under the Criminal Code of 1961 or the Criminal Code of 2012." 740 ILCS 147/10 (West 2012).

It is in establishing that statutorily defined term that the State failed to make its critical *prima facie* showing.

¶ 63    It goes without saying that the State alone bears the burden of providing at least some evidence supporting each and every element of the charged offense needed to make its *prima facie* case. *Kokinis v. Kotrich*, 81 Ill. 2d 151, 154-55 (1980).

> "According to Black's Law Dictionary, '*prima facie* evidence' is '[e]vidence that will establish a fact or sustain a judgment *unless contradictory evidence is produced*.' (Emphasis added.) Black's Law Dictionary 598 (8th ed. 2004). Likewise, '*prima facie*' is defined as '[s]ufficient to establish a fact *** *unless disproved or rebutted*.' (Emphasis added.) Black's Law Dictionary 1228 (8th ed. 2004)." *People v. Woodrum*, 223 Ill. 2d 286, 309-10 (2006).

Thus, only after the State has presented a *prima facie* case for each of the elements of the charged offense is the burden of production shifted to the defendant. *Woodrum*, 223 Ill. 2d at 310. Here, the State failed to make its requisite initial showing that the Latin Kings "engage[d] in a *course or pattern of criminal activity*." (Emphasis added.) 740 ILCS 147/10 (West 2012). Consequently, it did not present sufficient evidence to convict defendant of unlawful possession of a firearm by a street gang member.

¶ 64    The only evidence the State offered to overcome its burden of showing the Latin Kings met the legislatively mandated prerequisites for a "street gang" was the testimony of Detective Dammon. He testified widely about his extensive training and professional experience working with and interviewing gang members as well as investigating gang culture and crimes, demonstrating his indisputable expertise in those matters. He also expressed the general opinion that the Latin Kings are "an organized street gang as defined by our state [Streetgang Act]." Presumably to bolster that opinion, he added that gang members commit crimes and fight rival gangs to benefit their gang, that "[s]treet gangs' primary means of income is drug sales," and that members "need weapons to protect not only the drugs but the cash and themselves." He did not, however, offer *any* specific evidence on each of the legislatively mandated factors needed to fulfill section 10's strictly delineated definition of a "street gang." For instance, to be a street gang the group must have engaged in a "course or pattern of criminal activity," requiring evidence that it committed two gang-related criminal offenses within a single five-year period. Mere supposition or "common knowledge" that the Latin Kings not infrequently commit crimes cannot replace substantive evidence, and absolutely nothing in Detective Dammon's testimony comes close to making either prong of that mandatory showing. His broad general references to the commission of crimes by street gangs to generate income lack the specificity expressly mandated by our legislature. For that reason alone, this court should be compelled to conclude that the State failed to make the *prima facie* showing needed to shift the burden of production to the defendant and, ultimately, to convict him of unlawfully possessing a firearm as a street gang member. If that framework is applied, any discussion of Rule 705 or *Wilson* is both gratuitous and counterproductive. For that reason, I cannot join in the majority's Rule 705 analysis.

¶ 65    I believe that one other facet of the holding in this case merits further explanation. Admittedly, the conclusion that the State failed to prove that defendant was a street gang member after openly acknowledging that he was a member of the Latin Kings is, at best, counterintuitive. In enacting the relevant statutes, however, our legislature did not limit the

- 14 -

State's evidentiary burden to showing only that a particular group is commonly understood to be a street gang. Instead, the legislature carefully prescribed specific characteristics that the State had to prove via substantive evidence, thus imposing a far greater burden than could be overcome by reliance on mere supposition and common belief. See 740 ILCS 147/10 (West 2012) (enumerating the specific criteria defining a "street gang" for purposes of the relevant statutes). The objective criteria mandated for the State's requisite *prima facie* showing demands affirmative evidence that the defendant was a member of a street gang as it is painstakingly defined by statute. The State simply failed to make that showing here.

¶ 66     While that conclusion undoubtedly conflicts with the likely everyday wisdom that the Latin Kings are, in fact, the epitome of a street gang, this court cannot permit commonly held perceptions to take the place of substantive evidence when addressing the sufficiency of the State's *prima facie* case. To make that showing, the State must offer evidence on each of the objective statutory criteria expressly enacted by our legislature. *Kokinis*, 81 Ill. 2d at 154-55. It is not enough simply to present evidence of some, or even nearly all, of those criteria. To overlook a lesser showing to comport with commonly held perceptions would fatally undermine the legitimacy and constitutionality of our criminal justice system. "Close enough" can never be the standard used to determine whether the State has proven its *prima facie* case in a criminal prosecution. The constitution demands more, and it is both the duty and honor of this court to preserve the full complement of protections afforded to the citizens of Illinois whenever the State seeks to interfere with their liberty via criminal prosecution. See *Speiser v. Randall*, 357 U.S. 513, 526 (1958) (explaining that "[d]ue process commands that no man shall lose his liberty unless the Government has borne the burden of producing the evidence and convincing the factfinder of his guilt").

¶ 67     Here, holding the State's feet to the fire by requiring it to present a full *prima facie* case also does not unduly add to its burden. Given Detective Dammon's obvious expertise and expansive knowledge of street gangs and their workings, the addition of a few questions designed to elicit evidence on each component of the requisite statutory definition during the State's direct examination would, realistically, not have worked any additional hardship. And even if it did, we cannot alter the burden the legislature has chosen to impose on the State when it seeks to obtain a conviction for the unlawful possession of a firearm by a street gang member. Any change in that burden must be left to the General Assembly. *People v. Trainor*, 196 Ill. 2d 318, 342 (2001).

¶ 68     In sum, I conclude that the State failed to present a *prima facie* case that defendant was a street gang member at the time that he unlawfully possessed a gun in this case. That conviction, therefore, must be reversed. Accordingly, I concur in the majority's judgment and analysis, with the exception of the portion addressing Rule 705.

¶ 69     CHIEF JUSTICE KARMEIER joins in this special concurrence.


¶ 70     JUSTICE GARMAN, dissenting:

¶ 71     The majority's opinion stands in contravention of controlling law, mischaracterizes the evidence presented at defendant's trial, and adopts an absurd interpretation of the statute that will require the introduction of prejudicial evidence to convict a defendant based on crimes he personally may well have not committed or been involved in. Because I would find that

Detective Dammon's expert testimony was sufficient to prove that the Latin Kings are a street gang, I respectfully dissent.

¶ 72    "[A] witness, whether expert or lay, may provide an opinion on the ultimate issue in a case." *Richardson v. Chapman*, 175 Ill. 2d 98, 107 (1997). Because the trier of fact is not required to accept an expert's conclusion, the testimony does not usurp the province of the jury. *Id.* This concept applies in both civil and criminal contexts. *Zavala v. Powermatic, Inc.*, 167 Ill. 2d 542 (1995). Furthermore, an expert's opinion on an ultimate issue may satisfy the State's burden of proof beyond a reasonable doubt. See, *e.g.*, *In re Commitment of Fields*, 2014 IL 115542, ¶¶ 20-27 (in sexually violent person commitment proceeding, expert testimony satisfied the elements that the respondent had a mental disorder and that said disorder made it substantially probable that he would engage in acts of sexual violence).

¶ 73    Nonetheless, the majority concludes that, because Detective Dammon did not testify to the specific component facts necessary to show that the Latin Kings engage in a "course or pattern of criminal activity," his opinion on an ultimate issue, *i.e.*, whether the Latin Kings are a "street gang," fails. However, the majority's reasoning does not comport with this court's precedent or the Illinois Rules of Evidence.

¶ 74    Noticeably absent from the majority's analysis is any discussion of this court's decision in *Wilson v. Clark*, 84 Ill. 2d 186 (1981). In *Wilson*, this court expressly adopted Rules 703 and 705 of the Federal Rules of Evidence. *Id.* at 196. When adopted in *Wilson*, Federal Rule of Evidence 703 stated:

> " 'The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.' " *Id.* at 193 (quoting Fed. R. Evid. 703).

¶ 75    *Wilson* observed that Federal Rule of Evidence 703 allows expert opinions that are based on facts not in evidence. *Id.* "[T]he key element in applying Federal Rule 703 is whether the information upon which the expert bases his opinion is of a type that is reliable." *Id.* ("the rule applies to expert opinions based on firsthand observation, hypothetical questions, or presentation of data outside the court").

¶ 76    With regard to Federal Rule of Evidence 705, *Wilson* explained that "an expert may give an opinion without disclosing the facts underlying that opinion." *Id.* at 194. Federal Rule of Evidence 705 provides:

> " 'The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.' " *Id.* (quoting Fed. R. Evid. 705).

¶ 77    Critically, "[u]nder Rule 705[,] the burden is placed upon the adverse party during cross-examination to elicit the facts underlying the expert opinion." *Id.*

¶ 78    Under Rule 703 then, such underlying facts or data may be admitted " 'for the limited purpose of *explaining the basis* for the expert witness' opinion.' " (Emphasis added.) *City of Chicago v. Anthony*, 136 Ill. 2d 169, 185 (1990) (quoting *People v. Anderson*, 113 Ill. 2d 1, 12 (1986)). This is because Federal Rule of Evidence 703 "did not create an exception to the hearsay rule." *Id.* It is within the trial judge's discretion to ascertain whether the underlying

facts or data upon which an expert's opinion is based are of a type reasonably relied upon by experts in the same field. *Id.* at 186. Consequently, it is also within the trial judge's discretion whether to permit an expert witness to testify to such facts or data. *Id.* For example, the trial judge could determine that the "probative value in explaining the expert's opinion pales beside its likely prejudicial impact or its tendency to create confusion." *Anderson*, 113 Ill. 2d at 12.

¶ 79    As of January 1, 2011, this court adopted the Illinois Rules of Evidence. Ill. R. Evid. art. I (eff. Jan. 1, 2011). Relevant here, the language of Illinois Rule of Evidence 703 is nearly identical to that of the preamendment Federal Rule of Evidence 703 that was adopted in *Wilson*. See Ill. R. Evid. 703 (eff. Jan. 1, 2011); *People v. Lovejoy*, 235 Ill. 2d 97, 144 (2009) ("Illinois has not adopted the amended [federal] version of Rule 703."). Illinois Rule of Evidence 705 matches Federal Rule of Evidence 705, which was adopted in *Wilson*. See Ill. R. Evid. 705 (eff. Jan. 1, 2011). *Wilson* and its progeny were incorporated into the Illinois Rules of Evidence and remain good law.

¶ 80    The majority attempts to avoid any discussion of *Wilson* or Illinois Rule of Evidence 703 by mischaracterizing the State's argument, focusing only upon Illinois Rule of Evidence 705, and making unfounded extrapolations from inapposite case law. Beginning with its use of irrelevant case law, the majority approvingly cites three appellate court cases that involved expert testimony that was intrinsically scientific—unlike here—and thus required an explanation of the methodology or process used to arrive at the result and the expert's conclusion. See *People v. Fountain*, 2016 IL App (1st) 131474, ¶ 56 (historical cell site analysis); *People v. Simpson*, 2015 IL App (1st) 130303, ¶ 14 (footwear impression); *People v. Negron*, 2012 IL App (1st) 101194, ¶ 34 (fingerprint analysis).[1] Citing *People v. Mosby*, 25 Ill. 2d 400 (1962), the majority asserts that the State is attempting to shift the burden of proof to defendant and use cross-examination as an alternative means of establishing the elements of the offense beyond a reasonable doubt. *Supra* ¶ 30. Yet, *Mosby* never mentions the use of cross-examination to shift the burden of proof to a defendant. See *Mosby*, 25 Ill. 2d 400. The majority concludes that cross-examination was unnecessary because the State failed to present evidence by way of Detective Dammon's direct testimony that establishes the elements of the offense. For this proposition, the majority cites *People v. Howery*, 178 Ill. 2d 1 (1997), which is likewise inapposite. In that case, this court rejected the defendant's argument that certain remarks made by the trial court when delivering its ruling somehow shifted the burden of proof.[2] The majority adds that Illinois Rule of Evidence 705 unambiguously requires that Detective Dammon articulate the *reasons* for his opinion before the burden shifts to defendant

---

[1]The majority declares that "the correct application of Rule 705 is illustrated by *People v. Fountain*, 2016 IL App (1st) 131474, *People v. Simpson*, 2015 IL App (1st) 130303, and *People v. Negron*, 2012 IL App (1st) 101194," because the appellate court "noted that the experts testified on an ultimate issue or conclusion, detailed their analytic process and methodology, and also thoroughly explained the reasons for their opinions" and "acknowledged that Rule 705 permits an expert to testify in terms of opinion or inference and to give reasons therefor without divulging the underlying facts and data for it, which then shifts the burden to the opposing party to explore the same on cross-examination." *Supra* ¶¶ 32-33.

[2]This court determined that one remark demonstrated that the court merely considered and rejected the defendant's reasonable doubt defense and another remark demonstrated that the court made an effort to support the various theories set forth by the defendant. *Howery*, 178 Ill. 2d at 30-33.

- 17 -

to cross-examine Detective Dammon as to the facts and data underlying his opinion. Because, according to the majority, Detective Dammon "generally described in broad terms the types of information and facts on which his opinion was based" and "merely identif[ied] the source of those facts and data without explaining the reasons for his opinion," his testimony failed to prove the elements of the offense and thus shift the burden to defendant. *People v. Mpulamasaka*, 2016 IL App (2d) 130703, does not support the majority's position that the burden to cross-examine an expert does not shift unless the expert satisfies the "condition" of first explaining the reasons for his or her opinion—rather than offering supporting facts and data. There, after the defendant cross-examined the expert, the appellate court concluded that the expert did not supply *enough* facts to support the foundation for her opinion. See *id.* ¶¶ 38-42, 89, 95-96. The defendant's cross-examination of the expert actually brought out information that demonstrated the expert's ignorance of pertinent facts that would have informed her opinion. *Id.* ¶¶ 38-39, 95-96. Thus, the appellate court's criticism was not that the expert's direct testimony failed to shift the burden to defendant to perform cross-examination. Rather, the defendant's cross-examination showed that the foundation underlying the expert's opinion was deficient.

¶ 81    Critically, the majority misunderstands the interplay between Illinois Rules of Evidence 703 and 705. As mentioned, *Wilson* held that an expert may base his or her opinion testimony on facts that are not ordinarily admissible in evidence but that such facts may nevertheless come out on cross-examination or if the trial court so determines. See *Wilson*, 84 Ill. 2d at 194. The facts underlying an expert's opinion are not substantive evidence and are not admitted for their truth. Instead, such facts are admitted " 'for the limited purpose of explaining the basis for the expert witness' opinion.' " *Anthony*, 136 Ill. 2d at 185 (quoting *Anderson*, 113 Ill. 2d at 12); *In re Commitment of Butler*, 2013 IL App (1st) 113606, ¶ 31. Thus, requiring a defendant to test an expert's opinion by inquiring into the facts or data underlying the expert's opinion would never shift the burden of proof to the defendant in contravention of due process. Whatever facts the expert relied upon to arrive at his or her opinion would never constitute proof. Rather, it is an expert's ultimate opinion that may prove an element at issue (see, *e.g.*, *In re Commitment of Fields*, 2014 IL 115542, ¶¶ 20-27), and the trier of fact remains at all times free to accept or reject the expert's opinion (*Richardson*, 175 Ill. 2d at 107). The key inquiry is whether the facts or data underlying the expert's opinion are of a type reasonably relied upon by experts in the same field. *Anthony*, 136 Ill. 2d at 186.

¶ 82    The majority paints an incomplete picture of Detective Dammon's testimony at trial and draws a confounding distinction between reasons and facts. At trial, the State in fact laid an extensive foundation for Detective Dammon's opinion. Detective Dammon testified as to his experience with the Belvidere Police Department beginning in 1996, his position in the street gang unit, and his specialized training and courses taken in street gangs and gang activity, which included training dealing with active gangs in Chicago, the Chicago suburbs, and areas close to Belvidere and Rockford. Detective Dammon testified that he had been personally involved in over 400 gang crime investigations, had contact in his capacity as a gang officer and detective with gang members in Belvidere well over 1000 times, and personally interviewed people taken into custody for various gang offenses well over 1000 times. As a member of the street gang unit, Detective Dammon noted that he "enforce[s] laws for crimes that are being committed by gang members as well as for the LEADS database for other officers." He stated that, since his position changed in the gang unit in 1998, he regularly

interviews those taken into custody for gang offenses, which included admitted street gang members. Detective Dammon described how street gangs operate and are organized. He also provided specific testimony detailing the Latin Kings in the Belvidere area.

¶ 83    Once Detective Dammon was acknowledged as an expert in gang activity, the following testimony was elicited on direct examination:

"Q. Is the Latin Kings street gang, is that an organized street gang as defined by our state Street Gang Omnibus Act?

A. It is.

* * *

Q. Are the Latin Kings and Sureño 13s two major groups of gangs in the Belvidere area?

A. They are the two major groups of gangs in the Belvidere area.

* * *

Q. Are you familiar with those two gangs, the Latin Kings and the Sureño 13s?

A. I am.

* * *

Q. Now, is there a rivalry between the Latin Kings and the Sureño 13 in Belvidere?

A. There is.

Q. Have you handled criminal investigations regarding the two groups?

A. Numerous.

* * *

Q. Have you heard of the phrase *gang banging*?

A. Yes.

Q. And what does that mean?

A. It's when gang members are actually doing gang work other than hanging out. Committing crimes for the prosperity or benefit of a street gang.

Q. And how important are firearms to the—to street gangs?

A. They're very important. Street gangs' primary means of income is drug sales. Where you have drug sales, you have cash. The gangs need weapons to protect not only the drugs but the cash and themselves from other rival gangs.

Q. And with regard to gang banging, can that also mean fighting the opposite gang or fighting a rival gang?

A. It can, as well as intimidation of people. Anything to benefit the gang itself.

* * *

Q. And did you recognize some of the subjects?

A. I did.

Q. Who did you recognize?

A. I recognized Deontae Murray.

* * *

Q. Now, have you had contact with Deontae Murray, the defendant, Anthony Perez, and Max Cox in the context of gang investigations?

A. I have.

* * *

Q. Thank you. Now, with regard to the defendant, Max Cox, Anthony Perez, and Marco Hernandez, do you have an opinion as to whether they are members of a street gang?

A. They are all members of street gangs.

Q. And what is that based on?

A. My experience in dealing with each of them, speaking to them, as well as researching not only their LEADS record but information that's provided by other officers into the gang database with very reliable information including other graffiti that's been done by them, their associates being other gang members, and self-admissions." (Emphasis in original.)

¶ 84        Detective Dammon also testified to the specific types of sources that not only he but other experts in the same field rely upon in identifying someone as a gang member. Accordingly, not only was adequate foundation laid for Detective Dammon's expert opinion on an ultimate issue, but Detective Dammon testified that the facts, data, and sources he relied upon for his classifying the Latin Kings as a street gang were of a type relied on by other experts in the same field—and thus reliable. The majority fails to mention that Detective Dammon had experience dealing with defendant, had previously spoken to him, and that defendant admitted his Latin Kings membership to Detective Dammon. Given Detective Dammon's experience in handling numerous investigations regarding the Latin Kings and interviewing those taken into custody for gang offenses, it is difficult to understand how the majority could conclude that Detective Dammon gave no reason for his opinion, merely referenced the sources of the underlying facts and data, or failed to explain the "nexus" between LEADS, the Illinois Department of Corrections Information System, gang databases, or notes from other cases and offered no explanation as to why this information established that the Latin Kings were a street gang engaged in a "course or pattern of criminal activity."

¶ 85        Notably, defendant did not object to Detective Dammon's opinion or any of the sources that Detective Dammon stated that he relied upon for his opinion. Furthermore, the trial court also did not deem it necessary to require Detective Dammon to disclose on direct examination any facts or data relating to specific crimes committed by other Latin Kings to demonstrate that the Latin Kings engage in a "course or pattern of criminal activity" consistent with his opinion.

¶ 86        Detective Dammon's opinion that the Latin Kings are a street gang was proper, even though his direct testimony did not disclose the specific other crimes evidence underlying that opinion. See Ill. R. Evid. 703 (eff. Jan. 1, 2011); *Wilson*, 84 Ill. 2d at 194; *Robidoux v. Oliphant*, 201 Ill. 2d 324, 334 (2002) ("Thus, under *Wilson*, an expert testifying at trial may offer an opinion based on facts not in evidence, and the expert is not required on direct examination to disclose the facts underlying the expert's opinion.").

¶ 87        Once Detective Dammon provided his expert opinion on the street gang element, the burden shifted to defendant to cross-examine Detective Dammon on the facts underlying that opinion. See Ill. R. Evid. 705 (eff. Jan. 1, 2011); *Wilson*, 84 Ill. 2d at 194; see also *People v. Pasch*, 152 Ill. 2d 133, 179 (1992) ("[A]n expert may be cross-examined for the purpose of *explaining*, modifying, or discrediting his testimony, as well as to ascertain what factors were

- 20 -

taken into account *and what ones disregarded in arriving at his conclusions*." (Emphases added.)); *People v. Whitfield*, 140 Ill. App. 3d 433, 437 (1986) (expert's "unchallenged identification of the powder was sufficient for the jury to find beyond a reasonable doubt that it consisted of cocaine and heroin"). Defendant did not cross-examine Detective Dammon on whether his opinion was based on crimes that, for example, met the statutory definition of "course or pattern of criminal activity." See, *e.g.*, *Tsoukas v. Lapid*, 315 Ill. App. 3d 372, 380 (2000) ("It is not improper to allow questioning to discover what potentially relevant information plaintiff's expert may have failed to consider in reaching an opinion."). Such a closed-ended question would not disclose the dates that such crimes took place.

¶ 88    As mentioned, Detective Dammon testified that one of the specific types of sources he relied upon for his opinion is a gang database that is also relied upon by other experts in the same field.[3] Oddly, the lead opinion *sua sponte* takes "judicial notice" of the deficiencies noted by the City of Chicago inspector general of the Chicago Police Department's "Gang Database" and concludes that it lacks trustworthiness and thus does not fall within the Illinois Rule of Evidence 803(8) exception to the hearsay rule. First and foremost, Illinois Rule of Evidence 703, "Bases of Opinion Testimony by Experts," provides in relevant part that, "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." Ill. R. Evid. 703 (eff. Jan. 1, 2011). Accordingly, whether the Chicago Police Department's gang database falls within the Illinois Rule of Evidence 803(8) exception to the hearsay rule is irrelevant. See Ill. R. Evid. 803(8) (eff. Apr. 26, 2012). Second, the lead opinion is clearly attempting to subvert the application of Illinois Rule of Evidence 703 by casting doubt upon the reasonableness of gang experts' reliance upon gang databases. This is injudicious, unnecessary, and premature. The issue is tangential to the question raised in this appeal and was not addressed by the parties. Again, pursuant to Illinois Rule of Evidence 705, an adverse party would be free to cross-examine a gang expert that relies upon a gang database about purported flaws associated with the Chicago Police Department's gang database. In any event, Detective Dammon's opinion did not rely solely upon information from a gang database. For example, Detective Dammon also relied upon LEADS,[4] a source which the majority does not discuss. Third, Detective Dammon referenced not the Chicago Police Department's gang database but the Belvidere Police Department's own gang database. The specific qualms the

---

[3] Numerous cases have recognized gang experts' "reliance on information from centralized computer databases—such as arrest records, police reports, offense reports, jail records, probation reports, and 'contact cards'—as well as other reported and recorded statements that help flesh out the experts' understanding of gang customs, alliances, rivalries, activities, 'territories,' hierarchies, and membership." *People v. Berrios*, 2018 IL App (2d) 150824, ¶ 19; see also *People v. Jackson*, 145 Ill. App. 3d 626, 634 (1986) (observing that, as a matter of practicality, such information gathering is likely the only means by which a nongang member can collect details of gang activity and membership rank and that such data is not available to an average layperson).

[4] "The Illinois Law Enforcement Agencies Data System (LEADS) is a statewide, computerized, telecommunications system, maintained by the Illinois State Police, designed to provide the Illinois criminal justice community with access to computerized justice-related information at both the state and national level." *Law Enforcement Agencies Data System*, Illinois Integrated Justice Information System, http://icjia.state.il.us/iijis/public/word/SJIS/SJIS_LEADS.doc (last visited Oct. 4, 2019) [https://perma.cc/EX9Z-XLZN].

City of Chicago Office of Inspector General and the majority find with the Chicago Police Department's gang database thus do not necessarily carry over to Belvidere's. Quite simply, Chicago's gang database has nothing to do with this case.

¶ 89 The majority's holding robs a trial judge of his or her discretion to determine whether an expert is permitted or required to testify to the facts or bases underlying his or her expert opinion, which necessarily accounts for the prejudice that could arise from disclosure of such underlying facts and data. See Ill. R. Evid. 705 (eff. Jan. 1, 2011). The majority instead requires the introduction of potentially grossly prejudicial evidence that invites the trier of fact to determine a defendant's guilt by association.[5] So long as one such crime involves "the solicitation to commit, conspiracy to commit, attempt to commit, or commission of any offense defined as a felony or forcible felony under the Criminal Code of 2012" and both crimes occur within the relevant time period, prosecutors are free to pick from the most heinous of crimes to prove the " 'course or pattern of criminal activity' " element. See, *e.g.*, *People v. Hairston*, 46 Ill. 2d 348, 375 (1970) ("it is entirely proper for the prosecutor to dwell upon the evils of crime"); see also *Jackson*, 145 Ill. App. 3d at 641. I can think of no other context where the State is required to introduce other crimes evidence, against the defendant's penal interest, committed by individuals the defendant may not even know.

¶ 90 Even if a gang expert's ultimate opinion could not by itself prove that an entity constitutes a street gang, the decisions in *People v. Jamesson*, 329 Ill. App. 3d 446 (2002), and *Berrios*, 2018 IL App (2d) 150824, demonstrate a more prudent approach to establishing specific crime evidence that tempers the need for such evidence with the interest of avoiding introduction of more prejudice than is necessary. In those cases, the experts provided their respective opinions that the entities at issue were street gangs. Though specific crimes and exact dates were not elicited on direct examination, the trier of fact could conclude that the entities were street gangs based on the experts' testimony, opinions, and the reasonable inferences therefrom. *Jamesson*, 329 Ill. App. 3d at 460-61 (gang expert opined that the Latin Counts were a street gang, described his familiarity with the Latin Counts and two of its members, and testified that the police department began to have contact with the Latin Counts " 'a couple of years ago' " and that the Latin Counts have been involved in numerous violent incidents, which included aggravated batteries); *Berrios*, 2018 IL App (2d) 150824, ¶¶ 19, 22 (gang expert testified that he had been a member of the street gang unit for three years, which would be after the effective date of the Act, and that the gang unit " 'track[s]' " the Latin Kings and other street gangs; court noted that the expert's reliance upon gang information sheets was reasonable and that the expert relied on other sources like his specialized training in gang investigations, experience as a gang-crimes investigator, and familiarity with street gangs in the area).

---

[5]When Detective Dammon was asked about an individual by the name of Mallek Sanchez, defense counsel objected, and the State made a proffer, explaining that Detective Dammon would testify that Mallek Sanchez is a higher-ranking street gang member whose birthday party defendant was attending. When the court questioned the State as to what purpose this would serve, defense counsel interjected: "Guilt by association is what they're looking for, Your Honor." Detective Dammon explained that he investigated Mallek for distributing cocaine in Belvidere and that Mallek was charged and sentenced to the Department of Corrections for selling cocaine. Detective Dammon had been in contact with Mallek "several dozen times" in the context of street gang investigations.

¶ 91    In the instant case, the jury similarly could have inferred from Detective Dammon's testimony that the Latin Kings engage in a "course or pattern of criminal activity." Detective Dammon began working with the gang unit beginning in 1996, which postdates the effective date of the Act, and he was still a member of the street gang unit at the time of his testimony. In that capacity, he investigated several hundred street gang crimes, conducted "well over a thousand" interviews of people taken into custody for various gang offenses, enforced laws for crimes that "are being" committed by gang members, and prepared for gang-related trials. Defendant himself freely acknowledged being a Latin King at the time of the relevant events in question and repeatedly referred to the Latin Kings as a gang.[6] Defendant testified as follows:

> "Q. Now, Deontae, you've heard testimony from—well, at least Detective Dammon and perhaps Detective Wallace and Detective Washburn that you were affiliated with the Latin Kings?
>
> A. Yes, sir.
>
> Q. When did you become affiliated with the Latin Kings?
>
> A. When I was about 13 or 14.
>
> Q. How were you recruited?
>
> A. Placed on like a probation deal called being a shorty.
>
> Q. Okay. Being a shorty, is that—what exactly is that?
>
> A. Pretty much where they'll just see if you're fit for the gang.
>
> * * *
>
> Q. How were you initiated into the gang?
>
> A. Beat up.
>
> * * *
>
> Q. Is that how they get people to join their gang, they beat them up?
>
> A. I mean, that's how you become recruited, a member.
>
> * * *
>
> Q. Deontae, how old are you now?
>
> A. I'm 23, sir.
>
> Q. 23. And back on April 21st of 2013, how old were you?
>
> A. I was 21.
>
> Q. So at that point in time, you had been affiliated with the Kings for seven years?
>
> A. Yes, sir.
>
> * * *
>
> Q. You spent several days before you were arrested by the police; is that correct?
>
> A. Yes, sir.

---

[6]The lead opinion notes that, at the time of trial, defendant was no longer a member of the Latin Kings. Whether defendant was still a member of the Latin Kings at the time of trial is completely irrelevant. At trial, however, when Detective Dammon identified defendant, defendant was wearing a black tie and a gold and tan shirt. Detective Dammon testified that the Latin Kings' primary colors are black and gold but that they also use tan and black.

- 23 -

Q. Why didn't you go to the police earlier?

A. I mean, I didn't really think about, you know, what would happen. I mean, if I go to turn myself in, then later on I knew—that same night I knew that I had been charged—that I was being looked for so I thought I was going to be arrested. If I tell them my side of the story, I guess I'm put in the same position: I've got to run from the Kings for the rest of my life.

Q. What do you mean?

A. I know that if I came here and told on them, that's the only way I was going to be able to get my side of the story out. They'd probably hunt me down or try to get at me, try to hurt me or kill me or whatever. I'm not sure.

Q. When you say *they*, are you talking about the Latin Kings?

A. Yes, sir." (Emphasis in original.)

¶ 92 Defendant also testified that he was convicted of obstruction of justice on May 24, 2011, and of aggravated battery on May 2, 2012, both of which occurred during the time that defendant was a member of the Latin Kings.

¶ 93 For the reasons stated above, I would affirm the judgment of the appellate court affirming defendant's conviction for unlawful possession of a firearm by a street gang member (720 ILCS 5/24-1.8(a)(1) (West 2012)). The majority's holding takes this court on a dangerous and unnecessary pathway that seriously implicates defendant's due process rights.

¶ 94 JUSTICES THOMAS and THEIS join in this dissent.