2022 IL App (2d) 200741-U
No. 2-20-0741
Order filed March 21, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Boone County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 13-CF-87 |
| MARCO A. HERNANDEZ, | ) ) ) | Honorable C. Robert Tobin III, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) The trial court did not err in denying defendant's motion to sever his murder charge from the charge of unlawful possession of a firearm by a street gang member.  The State's proof of prior convictions of other gang members, which was statutorily required to prove the firearms charge, did not prejudice defendant. (2) There was no need to amend the mittimus to state that defendant is eligible for parole after serving 20 years in prison.

¶ 2    Defendant, Marco A. Hernandez, appeals from his convictions in the circuit court of Boone County on one count of first-degree murder (720 ILCS 5/9-1(a)(2) (West 2012)) and one count of unlawful possession of a firearm by a street gang member (720 ILCS 5/24-1.8(a)(1) (West 2012)). He contends that the trial court erred in denying his motion to sever the two charges and that the

mittimus should be amended to state that he is eligible for parole after 20 years in prison. Because the trial court did not commit reversible error in denying the motion to sever, and the information necessary for defendant to seek parole is readily available, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Defendant was indicted on one count of first-degree murder (720 ILCS 5/9-1(a)(2) (West 2012)) and one count of unlawful possession of a firearm by a street gang member (720 ILCS 5/24-1.8(a)(1) (West 2012)). The charges arose from the shooting death of Richard Herman in Belvidere on April 21, 2013. Following a jury trial, defendant was found guilty of both offenses. He appealed, and this court reversed and remanded for a new trial. See *People v. Hernandez*, 2017 IL App (2d) 141104-U.

¶ 5     On remand, defendant again opted for a jury trial. On the first day of trial, defendant orally moved to sever the charges and proceed first with the murder charge. In moving for severance, defense counsel stated that he believed that "for Appellate Court purposes, [he had] to make a motion to [sever]." He added that he "believe[d] that the street gang would–the Appellate Court would find that prejudicial for [defendant's] fair trial by bringing in the issue of street gang[s], and [he was] just making the motion for the record." The trial court stated that it did not think that the evidence necessary to prove possession of a firearm by a street gang member "would have any prejudice to it." The court further commented that the evidence related to gangs would be "admitted anyways for the first-degree murder." The court added that it understood where defense counsel was coming from regarding *People v. Murray*, 2019 IL 123289 and the *Murray* dissent's concern. Defense counsel responded that he "[j]ust wanted to bring it up." The court replied that it thought that the dissent in *Murray* shared defendant's concerns, but the court denied the motion to sever.

¶ 6    The following evidence was adduced at trial. At about 6:30 p.m. on April 21, 2013, Herman was fatally shot at a Shell gas station in Belvidere. Four eyewitnesses testified to the incident; two of them testified for the State and two for the defense.

¶ 7    Daniel Arevalo, who was working inside the Shell store as an attendant, testified that a Hispanic male and his black male companion purchased beer. Arevalo had seen the men before at the station. In photo lineups, he identified the Hispanic man as defendant and the black man as Deontae Murray (who is, indeed, an African American male). He also made an in-court identification of defendant. Arevalo testified that, right after defendant and Murray made their purchases, Herman and his companion, Max Cox, also purchased beer and gas.

¶ 8    Arevalo stated that, after both pairs exited the store, Cox and Herman returned to Cox's car. Cox began to pump gas. As he did so, Murray and defendant approached the two men. A verbal altercation began between the four men. According to Arevalo, defendant ran up to Herman, pulled a gun from behind his back, and shot Herman.

¶ 9    Cox testified that defendant and Murray approached Cox and Herman after they returned to their car from making purchases at the Shell store. Defendant accused Cox of having chased him in an earlier incident. Cox recognized defendant from that incident. He also recognized Murray from having sold him drugs. Cox was an associate of the Surenos 13 street gang. According to Cox, Murray accused him of "gang banging" and displayed a handgun tucked into the waistband of his pants. At one point, defendant took the gun from Murray. Defendant held the gun behind his back. Cox then told Herman, who was arguing with Murray, to shut up because defendant had a gun. Defendant then approached Herman and shot him once in the chest. When Herman collapsed, Cox went into the store and told the attendant to call 911.

¶ 10    Fatima Camargo, defendant's former girlfriend, testified that she was dating defendant in April 2013.  Around 8:30 a.m. on the day after the shooting, defendant knocked on her bedroom window.  He told her that a murder had happened.  He also told her that he had been at a Shell station and argued with Max and "Ricky," *i.e.*, Herman.  He further told her that he had used a gun to kill Herman.  He added that he had bought beer and left it at the Shell station.  According to Camargo, defendant was a member of the Latin Kings street gang.

¶ 11    Sergeant David Dammon of the Belvidere Police Department testified as an expert on street gangs.  He said that the police obtained information that defendant and Murray were at the home of Anthony Perez before and possibly after the shooting.  The police searched Perez's house and found a Glock .45 caliber handgun.  Only Perez's fingerprints were found on the Glock.  Forensic testing matched the Glock to a spent shell casing and a live round of ammunition found at the Shell station.

¶ 12    Sergeant Dammon testified that Murray, Perez, and defendant were members of the Latin Kings street gang.  Sergeant Dammon further testified that he had compiled a written report showing that 8 known Latin King gang members had a combined 11 felony convictions from 2010 through 2015 and that 10 of those convictions had been within 5 years of each other.  He did not testify to any details regarding the convictions.  The report identified the various offenses, including attempted murder, armed violence, aggravated discharge of a firearm, and aggravated battery.  Defendant stipulated to the report, and the trial court admitted it.  The court, however, did not allow it to be sent back with the jury during deliberations.

¶ 13    A forensic scientist with the state crime lab testified that defendant's fingerprints were recovered from a case of beer found outside the Shell station.

¶ 14    The State also presented evidence that, when officers arrived at a home in Belvidere to execute an arrest warrant for defendant, he attempted to flee—wearing only shorts—through a first-floor window.  He was arrested.

¶ 15    Gerald Keeney testified for the defense that he was at the Shell station during the shooting on April 21, 2013.  He was in his pickup truck in the station parking lot, scratching off lottery tickets that he had just purchased.  He heard an argument between four men but ignored it as he scratched off the tickets.  As he did so, he heard a gunshot.  He ducked down and did not pop back up for "roughly five, ten seconds."  When he looked up, he saw a black man holding a gun.  Keeney then ducked down again.  Looking up again, he saw "[t]wo gentlemen running off to the back of the station."  Keeney then dialed 911.  Because he was so afraid at the time, Keeney could not provide further details about the black man or describe the gun.

¶ 16    Linda Gomez testified for the defense that she also was at the Shell station.  As she looked for something in the back seat of her car, she saw two white men laughing as they exited the Shell station.  She then heard arguing at the opposite end of the station lot.  She saw the two white men and a black man arguing but did not see anyone else involved.  She then saw the black man pull out a gun and shoot one of the white men point-blank.  The black man then got into a white Jeep and drove away.  She admitted that she later told the police that " 'it was really hard for [her] to tell' " if the black man had shot the white man.

¶ 17    Carmargo testified for the defense that, at a prior hearing, she testified that defendant did not tell her who killed Herman.  She admitted on cross-examination that she was still dating defendant when she gave that prior testimony.

¶ 18    The jury found defendant guilty of both charges. Defendant then filed a motion for a new trial asserting, among other things, that the trial court erred in denying his motion to sever.  At the

hearing thereon, the State argued that the supreme court in *Murray* implicitly approved defendant's joint trial on the charges of murder and unlawful possession of a firearm by a street gang member. *Murray* concerned Murray's joint trial on the same charges arising from the same Belvidere shooting. See *Murray*, 2019 IL 123289, ¶¶ 1-12. The court denied the motion for a new trial.

¶ 19    Defendant was sentenced to 50 years' imprisonment on the murder conviction and a consecutive 5 years in prison for the firearm conviction. Defendant, in turn, filed this timely appeal.

¶ 20                                    II. ANALYSIS

¶ 21    On appeal, defendant contends that (1) the trial court erred in denying his motion to sever, because he suffered undue prejudice from the evidence regarding the felony convictions of his fellow gang members, and (2) the mittimus should be corrected to state that he is eligible for possible parole in 20 years. On the severance issue, defendant argues that, given the supreme court's explanation in *Murray*, of the requirements for proving unlawful possession of a firearm by a street gang member, "it is imperative that such [a] charge[ ] be severed when requested by the defense." Defendant cites the concerns of the dissent in *Murray* over the prior convictions necessary to establish the charge. See *Murray*, 2019 IL 123289, ¶¶ 71, 89 (Garman, J., dissenting).

¶ 22    The State responds that (1) defendant forfeited the severance issue because his arguments were not developed below, (2) the court did not err in denying the motion to sever, (3) if it did err, such error was harmless, and (4) the mittimus contains all information needed for defendant to be considered for parole.

¶ 23    We begin with forfeiture. To preserve a claim for review, a defendant must both object at trial and include the alleged error in a written posttrial motion. *People v. Thompson*, 238 Ill. 2d 598, 611-12 (2010). Here, on the first day of trial, defendant orally moved to sever the charges.

In doing so, he pointed to the prejudice that would result from the gang evidence. Although defense counsel did not mention *Murray*, the trial court observed that the dissenting opinion in *Murray* was based on the same concerns about prejudice that counsel had in this case. Thus, in our view, defendant's oral motion sufficiently raised a severance issue based on concerns over prejudice akin to those raised in the *Murray* dissent. Further, in his written motion for a new trial, defendant asserted that the court had erred in denying his motion to sever. Although defendant did not mention *Murray*, the State did so in its response. Accordingly, the issue that defendant now seeks to raise on review was raised in the trial court. Even if there were forfeiture, we would exercise our discretion to review the issue. *People v. Curry*, 2018 IL App (1st) 152616, ¶ 36 ("[F]orfeiture is a limitation on the parties, not the court, and we may exercise our discretion to review an otherwise forfeited issue.").

¶ 24    We turn next to the issue of whether the trial court erred in denying defendant's motion to sever. It did not.

¶ 25    Generally, charges arising out of the same incident may be tried together (725 ILCS 5/114-7 (West 2012)), unless it appears that the defendant will be prejudiced thereby (725 ILCS 5/114-8 (West 2012)). A trial court has substantial discretion in deciding whether to sever separate charges, and its decision will not be overturned on appeal absent an abuse of that discretion. *People v. Anderson*, 2013 IL App (2d) 111183, ¶ 68.

¶ 26    Here, defendant contends that he was unduly prejudiced by the joinder of the murder charge and the firearms charge because of the evidence of prior convictions by fellow gang members necessary to prove the firearms charge. In so arguing, he primarily relies on the dissent in *Murray*.

¶ 27    In *Murray*, the supreme court held that, to prove the offense of unlawful possession of a firearm by a street gang member, the State must prove, among other things, that the alleged street

gang engaged in specific crimes, as required by the Illinois Streetgang Terrorism Omnibus Prevention Act (Act) (740 ILCS 147/10 (West 2012)). *Murray*, 2019 IL 123289, ¶ 36; see also 720 ILCS 5/24-1.8(c) (West 2012) (providing that, for purposes of the offense of unlawful possession of a firearm by a street gang member, "street gang" has the meaning ascribed to it by the Act). Because the gang expert in *Murray* (Sergeant Dammon) did not offer such evidence, the supreme court vacated Murray's conviction of unlawful possession of a firearm by a member of a street gang. *Murray*, 2019 IL 123289, ¶ 53.

¶ 28    Justice Garman dissented in *Murray*, challenging the majority's holding that the State must prove that the street gang of which the defendant is an alleged member committed specific crimes. She claimed that the majority "adopt[ed] an absurd interpretation of the statute." *Murray*, 2019 IL 123289, ¶ 71 (Garman, J., dissenting). The majority's interpretation "will require the introduction of prejudicial evidence to convict a defendant based on crimes he personally may well have not committed or been involved in," thus "invit[ing] the trier of fact to determine a defendant's guilt by association." *Murray*, 2019 IL 123289, ¶¶ 71, 89 (Garman, J., dissenting). Justice Garman could "think of no other context where the State is required to introduce other crimes evidence, against the defendant's penal interest, committed by individuals the defendant may not even know." *Murray*, 2019 IL 123289, ¶ 89 (Garman, J., dissenting).

¶ 29    Here, Sergeant Dammon testified that Latin King members had been convicted of 11 felony offenses between 2010 and 2015. That testimony was required by *Murray*. It was not, however, so prejudicial as to deny defendant a fair trial. Significantly, Sergeant Dammon did not testify to the particulars of those offenses. Although his report was admitted, it was not provided to the jury during deliberations. Nor did Sergeant Dammon attribute any of the convictions to defendant. Although the State was required to prove only *two* specific crimes (see *Murray*, 2019 IL 123289,

¶ 34 (citing 740 ILCS 147/10 (West 2012)), we cannot say that, under the circumstances of this case, the mere number of prior crimes was unduly prejudicial. Thus, the trial court did not abuse its discretion in denying defendant's motion to sever the charges.

¶ 30 Defendant's reliance on *People v. Edwards*, 63 Ill. 2d 134 (1976), and *People v. Bracey*, 52 Ill. App. 3d 266 (1977) is misplaced. In both of those cases, the evidence that was deemed unduly prejudicial consisted of the defendant's own prior conviction. *Edwards*, 63 Ill. 2d at 138-139; *Bracey*, 52 Ill. App. 3d at 273. Evidence in a jury trial of a defendant's prior conviction is markedly more prejudicial than evidence of others' prior convictions. Thus, neither *Edwards* nor *Bracey* supports defendant's position.

¶ 31 We also reject any suggestion by defendant that the potential prejudice from the required evidence of specific crimes by a street gang always requires severance of the charge of unlawful possession of a firearm by a street gang member. There is nothing in *Murray* to support that proposition. More importantly, as discussed, the trial court has substantial discretion in deciding whether to sever charges. Accordingly, each motion to sever must be decided under the particular facts of each case.

¶ 32 Even if the trial court erred in denying the motion to sever, any such error was harmless. See *People v. Thurow*, 203 Ill. 2d 352, 363 (2003) (to establish harmless error, the State must show beyond a reasonable doubt that the verdict would have been the same absent the error). Here, there was significant evidence of defendant's guilt irrespective of the evidence of crimes by the Latin Kings. Two witnesses—Arevalo and Cox—clearly identified defendant as the shooter. Although Keeney testified that he heard a shot and saw a black male holding the gun, the sequence of events he described is critical. He stated that he ducked after hearing the shot and that he waited for 5 to 10 seconds before he looked up and saw the black man with the gun. That was ample time for

defendant to have handed the gun back to Murray. Although Gomez testified that she saw a black male shoot Herman, she also claimed to have seen only three men, which was entirely inconsistent with the testimony of the other witnesses. She also admitted that she told the police that she had difficulty telling if the black man shot the white man.

¶ 33    More compelling was the testimony of Camargo, defendant's former girlfriend, who testified that defendant told her the next day that he had killed Herman with a gun. Although she testified previously that defendant never told her who killed Herman, she admitted that she was still dating defendant when she originally testified. Lastly, when police tried to execute the arrest warrant for defendant at a home in Belvidere, he attempted to flee by climbing out a window while wearing only shorts. That evinced consciousness of guilt. See *People v. Lewis*, 2015 IL App (1st) 122411, ¶ 73 (evidence of flight to avoid arrest may be considered as tending to prove guilt). Thus, there was sufficient evidence, apart from the specific crimes by other Latin Kings members, to prove defendant guilty beyond a reasonable doubt. Any error in denying defendant's motion to sever was harmless.[1]

¶ 34    That leaves the issue of whether the mittimus was required to state that defendant is eligible to seek parole after serving 20 years in prison. The parties agree that, because defendant was sentenced after June 1, 2019, and was under 21 years old when he committed the murder, he is

---

[1] We do not agree with the State that any error was harmless because, had the charges been severed, the gang evidence would have been admissible at defendant's separate murder trial to show motive. Although evidence of gang affiliation might have been admissible at defendant's separate murder trial, the evidence of specific crimes committed by the gang members likely would not have been.

eligible to petition for parole after serving 20 years in prison. See 730 ILCS 5/5-4.5-115 (West 2020). We agree with the State that it is for the Prisoner Review Board to determine defendant's eligibility if and when he petitions for parole. The State is also correct that all information necessary to establish defendant's eligibility for parole at the appropriate time is readily available. The mittimus includes defendant's age, the date of sentencing, and the offenses for which he was sentenced. The only additional relevant fact is the date of the offense, which is contained in the indictment as well as the trial record. There is no need to amend the mittimus.

¶ 35                                   III. CONCLUSION

¶ 36    For the reasons stated, we affirm the judgment of the circuit court of Boone County.

¶ 37    Affirmed.