2024 IL App (1st) 230431-U

No. 1-23-0431

Order filed August 16, 2024

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CR 1296 01 |
| | ) | |
| ANDRES GARDUZA, | ) | Honorable |
| | ) | Timothy J. Joyce, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court.
Presiding Justice Johnson and Justice C.A. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Reversing defendant's conviction for unlawful possession of a weapon by a street gang member where the State failed to prove that defendant was a street gang member and remanding for the imposition of sentence on merged counts.

¶ 2    A jury convicted Andres Garduza of unlawful possession of a firearm by a street gang member and two counts of aggravated unlawful use of a weapon (AUUW). The trial court merged the counts and sentenced Garduza to 4½ years' in prison for unlawful possession of a firearm by a street gang member. On appeal, he argues the State failed to prove that he was an active member

of a street gang. He also argues ineffective assistance of counsel for failing to request a jury instruction regarding police officers' failure to activate their body-worn cameras and admitting to contested elements of the offenses.

¶ 3     We reverse Garduza's conviction and remand for the trial court to impose sentence on the merged AUUW counts. Our supreme court has interpreted the relevant section as applying to gang members who actively participate in criminal activities on behalf of the gang. *People v. Villareal*, 2023 IL 127318. The State failed to prove that Garduza was an active member of a gang.

¶ 4                               Background

¶ 5     Garduza was charged by indictment with multiple counts alleging he illegally possessed a firearm. The State proceeded on (i) count I for unlawful possession of a firearm by a street gang member (720 ILCS 5/24-1.8(a)(1) (West 2018)), (ii) count II for AUUW predicated on lacking a valid concealed carry license (CCL) and firearm owner's identification (FOID) card (720 ILCS 5/24-1.6(a)(1), (a)(3)(A-5); (a)(1), (a)(3)(C) (West 2018)), and (iii) count V for AUUW predicated on being previously adjudicated a delinquent minor for an act that would have been a felony if committed by an adult (720 ILCS 5/24-1.6(a)(1), (a)(3)(D) (West 2018)).

¶ 6     At trial, Chicago police officer Jaime Acosta testified that he was a "district intelligence officer" who obtained intelligence on gang members to disseminate and prevent gang violence. He had formerly been on a tactical team concentrated "mainly" on "gang-driven shootings."

¶ 7     At 11 p.m. on New Year's Eve 2018, Acosta and Officer Adam Bourdosis entered a gangway and surveyed the block. Acosta wore a body camera but did not activate it as he did not want his position discovered. Once activated, the camera beeps loudly every 30 seconds and emits a bright green light.

¶ 8      From the gangway, Acosta saw two people on the sidewalk in front of a residence, several houses away. One of them, Garduza, removed "a very large firearm with an extended magazine" from his waistband. Acosta and Bourdosis returned to officers waiting in a police vehicle and drove to where Garduza stood. When Acosta approached, Garduza and the other individual ran up the stairs to the front door and entered a multifamily residence with the first floor elevated 6 to 10 steps. As Garduza did so, he held the firearm in his right hand. Acosta pursued, but the front door was locked. Acosta unsuccessfully tried to force entry. Looking through a window just left of the door, he made out "two silhouettes" running towards the back of the apartment.

¶ 9      Acosta and Bourdosis ran to a "back side door," which was unlocked. Acosta opened it and saw Garduza and the other individual atop a flight of stairs leading to a residence on the first floor. They ran inside. Acosta followed and detained them in the living room. Also in the residence were two other men, one woman, and a child. Garduza and the men were taken outside while officers searched for Garduza's weapon.

¶ 10     The State published a clip of video footage captured by Acosta's body-worn camera, which we have reviewed. Acosta testified that the footage's time-stamp of 5:06 was six hours fast. The video clip shows Acosta ordering men in the living room to the ground. For the remainder of the clip, Acosta searches the living room and kitchen area. According to Acosta, his camera was deactivated at 5:12:40. He did not recall exactly why he deactivated the camera but thought the search would be unsuccessful. Acosta later learned that officers discovered a weapon. Acosta identified a firearm and extended magazine as the weapon he had seen in Garduza's possession.

¶ 11     Garduza was arrested and taken to the police station. Acosta advised Garduza of his *Miranda* rights and Garduza indicated he understood them. About two hours later, Acosta spoke

with Garduza again. He lied that Garduza's fingerprints were found on the weapon. Garduza admitted that he had the firearm and planned to fire it in the air at midnight. When he saw the police, he ran into the residence and placed the firearm next to the toilet. He further admitted being a "[r]egular soldier" of the Latin Kings gang for four years and explained his gang-related tattoos.

¶ 12     Acosta captured his interview with Garduza on his body-worn camera. The State published the video, and we have reviewed it. In the interview, Acosta tells Garduza that Garduza's fingerprints were discovered on the firearm and asks if Garduza had been "busting out" in front of the house. Garduza responds in the affirmative. Acosta asks who put the firearms behind the toilet, and Garduza admits he did, pointing out that he planned to shoot it in the air at midnight for New Year's Eve and agrees that was "it," as in the only reason he had the firearm. Acosta asks where Garduza was a "king," and Garduza says 23rd and Spaulding, for four years with the rank of "soldier." He had "LK" tattoos on his hands and a five-point crown on his arm. He nods when asked if "LK" stands for "Latin Kings."

¶ 13     Acosta testified that he was familiar with the Latin Kings, "a criminal street organization" with over 10,000 members that committed crimes "such as racketeering, drug sales, drug manufacturing, violent crimes, and armed robberies and carjackings." Acosta gave examples of the Latin Kings' criminal activity of which he had personal knowledge. None of the examples involved Garduza.

¶ 14     Acosta said that three people were in charge of every block in the Latin Kings' territory, an "Inca," "Cassique," and "Enforcer," and explained their respective roles. As for signifiers indicating membership in the Latin Kings, he spoke of tattoos such as "LK" and a five-pointed crown as sometimes referring to the specific block the member was from. Acosta identified

photographs of Garduza's tattoos, depicting "L" and "K" tattoos on forearms and a five-pointed crown beside "23" and "S" on his shoulder. The "23" and "S" stood for 23rd and Spaulding. Acosta opined that Garduza belonged to the Latin Kings based on "[h]is statement, his tattoos," and "his association to members of the gang and from information that [Acosta had] obtained through intelligence reports throughout the years."

¶ 15     On cross-examination, Acosta testified that when he and Bourdosis went to the gangway, two partners remained in the police vehicle in an alley and could not have seen the front of the house where Garduza stood. Acosta agreed that, after Garduza ran inside, Acosta had "engaged in a law enforcement-related activity" and, thus, violated a police department order to activate his body camera. Acosta claimed that the body cameras were "fairly new" and he was not "used" to them, adding that it was a "high-stress situation" as he had just seen a person with a large magazine, which was difficult to "put that aside" and ensure his camera was on. He activated his camera 5 to 10 seconds before entering the house. He may have deactivated it after about five minutes because he had finished or because his pregnant wife phoned rather than "for any malicious reason." He reactivated it when he heard a firearm had been found; he was no longer searching then but "just walking through everywhere." After arresting Garduza, he activated his body-camera for another call, but that call did not involve "the same type of stressful environment."

¶ 16     The defense published another clip of Acosta's body-worn camera footage. He agreed the footage showed him activating his camera "the moment" another officer found firearms in the bathroom. The clip is not included in the record on appeal.

¶ 17     Bourdosis testified consistently with Acosta. He also testified that he activated his body-worn camera when he entered the residence. They searched for about 12 minutes before Sergeant

Juan Perez arrived and found two firearms in the bathroom hidden in a space found by lifting the bottom of a cupboard. As Bourdosis entered the bathroom, he realized his body camera had deactivated and reactivated it before seeing the loaded firearm. He identified the firearm and extended magazine in court.

¶ 18   The State published Bourdosis's body-worn camera footage, consisting of two video clips. We have reviewed both video clips. The first clip begins at 5:07 and lasts about 12 minutes. It shows officers detaining the men inside the residence. The second starts at 5:20:04 and shows an officer in the bathroom lifting the bottom shelf of an open cupboard next to the toilet, revealing a hole beneath the shelf. The officer says he found "two of them."

¶ 19   Bourdosis tells the officer that he has gloves, reaches into the hole, and removes a firearm with a long magazine. Another officer removes a second firearm. Bourdosis leaves the bathroom and detaches the extended magazine from the firearm. A bullet is visible on top of the magazine. On cross-examination, Bourdosis testified that the body cameras at the time had a "problem" in that the power switch "easily can just be hit on and off."

¶ 20   Chicago police sergeant Juan Perez testified that he got a call to assist. In the bathroom, Perez saw a panel that looked disturbed and he lifted the panel and saw two handguns. Perez was wearing a body camera, and the State published the footage, which we have reviewed. It begins at 5:19 and shows Perez on a landing in the rear stairwell, then descending into the first-floor residence and entering the bathroom. He lifts the bottom panel of a cupboard next to the toilet, revealing a hole beneath. Perez says, "There's two of them."

¶ 21   On cross-examination, Perez said he thought his body-camera was on when he arrived. In any event, he turned it on just before he found the firearms.

¶ 22     After stipulating that Garduza had never been issued a FOID card or a concealed carry license and was adjudicated a delinquent minor for an offense qualifying him for AUUW, the State rested.

¶ 23     The trial court denied Garduza's motion for a directed finding.

¶ 24     Defense counsel indicated she had a stipulation that would impeach Acosta and Bourdosis that they alone conducted surveillance. The stipulation stated that Chicago police officer Michael Carreon told the grand jury of his participation in the surveillance and saw the two men in front of the house. He said he was near the residence around 11 p.m. and saw Garduza on the sidewalk removing a black semiautomatic handgun with a large extended magazine from his waistband.

¶ 25     The State objected that the stipulation did not constitute impeachment because Acosta and Bourdosis might not have been with Carreon when he saw the men. The court acknowledged that the State "ha[d] a point" but overruled the objection.

¶ 26     In closing arguments, defense counsel told the jury to "[g]o ahead" and conclude that Garduza belonged to the Latin Kings, a gang. Nevertheless, the State failed to prove that Garduza possessed a firearm, where the officers' testimony was incredible given their "selective recording" with body cameras.

¶ 27     The jury found Garduza guilty on all three counts. The court denied his motion for a new trial. After a sentencing hearing, the court merged AUUW counts II and V into count I for unlawful possession of a firearm by a street gang member and sentenced Garduza to 4½ years in prison.

¶ 28                                     Analysis

¶ 29     First, Garduza argues that the State failed to prove him guilty of unlawful possession of a firearm by a street gang member.

¶ 30 Due process requires the State to prove each element of a criminal offense beyond a reasonable doubt. *People v. Murray*, 2019 IL 123289, ¶ 28. When a defendant challenges the sufficiency of the evidence, we determine whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the elements beyond a reasonable doubt. *People v. Sauls*, 2022 IL 127732, ¶ 52. We do not retry the defendant. *Id.* The factfinder resolves conflicts in testimony, weighs the evidence, and draws inferences from the facts. *Id.* We will reverse a conviction where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. *Id.*

¶ 31 Defendants commit unlawful possession of a firearm by a street gang member when they knowingly possess on or about their person a firearm and ammunition outside their home or place of business, have not been issued a valid FOID card, and belong to a street gang. 720 ILCS 5/24-1.8(a)(1) (West 2018). Garduza contests that the State proved he was a member of a street gang.

¶ 32 The Illinois Streetgang Terrorism Omnibus Prevention Act (Act) (740 ILCS 147/1 *et seq.* (West 2018)) defines a gang as "any combination, confederation, alliance, network, conspiracy, understanding, or other similar conjoining *** of 3 or more persons with an established hierarchy that, through its membership or through the agency of any member engages in a course or pattern of criminal activity." 740 ILCS 147/10 (West 2018). A "gang member" means (i) "any person who actually and in fact belongs to a gang," and (ii) "any person who knowingly acts in the capacity of an agent for or accessory to, or is legally accountable for, or voluntarily associates himself with a course or pattern of gang-related criminal activity, whether in a preparatory, executory, or cover-up phase of any activity, or who knowingly performs, aids, or abets any such activity." *Id.*

¶ 33  Further, a "[c]ourse or pattern of criminal activity" involves two or more "gang-related criminal offenses" when (i) at least one was committed after January 1, 1993; (ii) both offenses were committed within five years of each other; and (iii) at least one offense involved a felony or the solicitation, conspiracy, or attempt to commit a felony. *Id.*; *People v. Villareal*, 2023 IL 127318, ¶ 16. "[G]ang-related" means "any criminal activity, enterprise, pursuit, or undertaking directed by, ordered by, authorized by, consented to, agreed to, requested by, acquiesced in, or ratified by any gang leader, officer, or governing or policy-making person or authority, or by any agent, representative, or deputy of any such officer, person, or authority" intended to benefit the gang. 740 ILCS 147/10 (West 2018); *Villareal*, 2023 IL 127318, ¶ 16.

¶ 34  In *Villareal*, the Illinois Supreme Court held that the Act's second definition of a gang member—a person who acts as agent or accessory to a course or pattern of gang-related criminal activity or is legally accountable for or voluntarily associates with the same—as "undoubtedly" encompassing active participation in gang-related criminal activity. *Id.* ¶ 27. Villareal, also convicted under section 24-1.8(a)(1), argued that the section violated substantive due process as it could punish "individuals with mere passive association with the gang." *Id.* ¶ 26.

¶ 35  The court also determined that the first definition of gang member—a person who "actually and in fact" belongs to a gang—referred "to a level of association beyond mere passive association." *Id.* ¶ 26. Based on the dictionary definition of "belong," the court determined that "to belong to a gang" meant "to be attached or bound to a gang in a manner expressing an active devotion or loyalty to the gang." *Id.* ¶ 28. Further, considering the Act's definitions of a gang, course or pattern of criminal activity, and gang-related criminal activity, the Act indicated that "gang members are necessarily active participants in criminal activities on behalf of the gang." *Id.*

¶ 29. The court concluded, "For an individual to be prosecuted for unlawful possession of a firearm in public as a gang member, the State must prove—as an element of the offense—the individual was an active gang member at the time he possessed the firearm," rather than a "passive" member. *Id.* ¶ 31.

¶ 36    The court also rejected Villareal's additional argument that the statute was void for vagueness, reiterating that "the definition of a 'gang member' requires active participation in criminal activity by an actual gang member or one acting as an agent for the gang." *Id.* ¶ 37.

¶ 37    Garduza claims the State did not prove that he was an active Latin Kings member, citing *Villareal*. He acknowledges admitting to being a member of the Latin Kings and does not contest that the State proved the Latin Kings are a street gang. But, he asserts, the State failed to prove he was an active member as it never established his involvement in the gang's criminal activities. In response, the State argues that *Villareal* held only that a defendant must be an active member in the sense that they are not a passive or former member and that the gang itself was involved in a course or pattern of criminal activity, not that the State had to prove defendant's involvement in specific gang-related criminal activity. We disagree.

¶ 38    The supreme court defined an active member as a participant in the gang's criminal activity. *Id.* ¶¶ 29-30, 37 ("[G]ang members are necessarily active participants in criminal activities on behalf of the gang," legislators intended section 24-1.8(a)(1) encompass only gang members actively engaged in the gang's criminal enterprise, and "gang member" requires active participation in criminal activity or acting as an agent for the gang).

¶ 39    Although Garduza admitted to being a member of the Latin Kings for four years and having the rank of "soldier" and gang-related tattoos, those admissions did not establish participation in

gang-related criminal activity. Also, Acosta's testimony did not address the duties of a "soldier" or establish that soldiers participated in the criminal activity. Thus, the State failed to establish that Garduza "actually and in fact" belonged to the Latin Kings, as doing so required proving him to be an active member who participated in the gang's criminal activities. See *Id.*, ¶¶ 26-31, 37.

¶ 40    Garduza indicated he was "busting out" in front of the house, and Acosta testified that "bust outs" "hang out outside and represent" for the gang on weekends and holidays. Nevertheless, Acosta's definition of "busting out" disregards the Act's definition of gang-related activity, which refers only to "*criminal*" activities, enterprises, pursuits, or undertakings intended to benefit the gang. (Emphasis added.) 740 ILCS 147/10 (West 2018); see also *Murray*, 2019 IL 123289, ¶ 48 ("The Act provides that 'gang-related' means any *criminal* activity directed by any gang leader or authority" intended to benefit the gang (emphasis added)).

¶ 41    The State fails to explain how "hanging out outside when they're supposed to be" constitutes criminal activity or presents evidence contradicting Garduza that he possessed the firearm to shoot in the air at midnight. Nor did the State establish that Garduza possessed the firearm for a gang-related purpose or Acosta testify that bust outs are typically armed.

¶ 42    Further, despite its contention to the contrary, the State failed to prove that Garduza voluntarily associated himself with a course or pattern of gang-related criminal activity under the Act's second definition of "gang member." See 740 ILCS 147/10 (West 2018). A course or pattern of criminal activity comprises at least two gang-related offenses committed within five years of each other, at least one of which involved a felony. *Id.* To satisfy the second definition, the defendant must voluntarily associate with a course or pattern of gang-related criminal activity "in a preparatory, executory, or cover-up phase of any activity" or knowingly perform, aid, or abet the

activity. *Id.* In *Villareal*, the supreme court stated that to associate with activity was "in the same vein as one who acts as an agent or accessory in the planning, execution, and cover-up of a gang-related offense" and meant to join "as a partner, friend, companion, or ally in [its] preparation, execution, or cover-up." *Villareal*, 2023 IL 127318, ¶¶ 38-39.

¶ 43    Here, no evidence linked Garduza to the preparation, execution, or cover-up of two or more gang-related offenses. Although Acosta testified to examples of prior criminal activity by the Latin Kings, he did not testify that Garduza was involved. Accordingly, the State failed to prove that Garduza voluntarily associated with a course or pattern of gang-related criminal activity.

¶ 44    Having reversed his sentenced conviction and remanded for the circuit court to impose sentence on the AUUW counts, we need not address Garduza's claim for ineffective assistance.

¶ 45    Reversed and remanded with instructions