2026 IL App (1st) 230431-B

No. 1-23-0431

Opinion filed March 6, 2026

Sixth Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CR 1296 01 |
| | ) | |
| ANDRES GARDUZA, | ) | Honorable |
| | ) | Timothy J. Joyce, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Presiding Justice C.A. Walker and Justice Johnson concurred in the judgment and opinion.

**OPINION**

¶ 1    A jury convicted Andres Garduza of unlawful possession of a firearm by a street gang member and two counts of aggravated unlawful use of a weapon (AUUW). The trial court merged the counts and sentenced Garduza to 4½ years in prison for unlawful possession of a firearm by a street gang member. On appeal, he argued that the State failed to prove that he was an active member of a street gang. He also argued ineffective assistance of counsel for (i) failing to request a jury instruction regarding the inactivated police body-worn cameras and (ii) admitting to contested elements of the offenses.

¶ 2    In an Illinois Supreme Court Rule 23 (eff. Feb. 1, 2023) order issued August 16, 2024, we reversed Garduza's gang-related conviction and remanded for the trial court to impose sentence on the merged AUUW counts. *People v. Garduza*, 2024 IL App (1st) 230431-U. We interpreted the AAUW statute as applying to gang members who actively participate in criminal activities on behalf of the gang. *Id.* ¶ 40; *People v. Villareal*, 2023 IL 127318, ¶ 30. The State failed to prove that Garduza was an active gang member. *Garduza*, 2024 IL App (1st) 230431-U, ¶ 39. Additionally, we concluded that we lacked jurisdiction to review Garduza's ineffective assistance arguments as those arguments went only to the unsentenced guilty findings on the AUUW counts. *Id.* ¶ 44.

¶ 3    After we denied rehearing, Garduza moved for a supervisory order in the Illinois Supreme Court for review of his ineffective assistance of counsel claims. The supreme court allowed the motion and directed that we vacate the judgment and address ineffective assistance to determine whether a different result is warranted.

¶ 4    We reverse Garduza's conviction for unlawful possession of a weapon by a street gang member, where the State failed to prove that defendant was a street gang member, and remand for the imposition of sentence on merged counts. Regarding the claim of ineffective assistance of counsel, we hold that Garduza was prejudiced neither by the failure to request the jury instruction nor by his counsel's stipulation to a police officer's grand jury testimony that corroborated trial testimony.

¶ 5                                    Background

¶ 6    Garduza was charged by indictment with multiple counts, alleging he illegally possessed a firearm. The State proceeded on (i) count I for unlawful possession of a firearm by a street gang

member (720 ILCS 5/24-1.8(a)(1) (West 2018)), (ii) count II for AUUW predicated on lacking a valid concealed carry license (CCL) and firearm owner's identification (FOID) card (*id.* § 24-1.6(a)(1), (a)(3)(A-5); (a)(1), (a)(3)(C)), and (iii) count V for AUUW predicated on previously having been adjudicated a delinquent minor for an act that would have been a felony if committed by an adult (*id.* § 24-1.6(a)(1), (a)(3)(D)).

¶ 7     At trial, Chicago police officer Jaime Acosta testified that he served as a "district intelligence officer" responsible for gathering intelligence on gang members to prevent gang violence. He previously worked on a tactical team focused on "gang-driven shootings."

¶ 8     On New Year's Eve 2018, Acosta and Officer Adam Bourdosis participated in a 10-person tactical team conducting surveillance in the neighborhood due to reported criminal activity. They entered a gangway to monitor the area. Acosta wore a body camera but chose not to activate it to avoid revealing his position, as the camera emits a loud beep every 30 seconds and a bright green light.

¶ 9     From the gangway, Acosta saw two people on the sidewalk several houses away. One of them, Garduza, removed "a very large firearm with an extended magazine" from his waistband. Acosta, Bourdosis, and other officers drove to where Garduza stood. When Acosta approached, Garduza and another individual ran upstairs and entered an apartment building. Garduza held a firearm in his right hand. Acosta pursued, but the front door was locked. Looking through a window, Acosta made out "two silhouettes" running toward the back.

¶ 10     Acosta and Bourdosis ran to a "back side door," which was unlocked. Acosta opened it and saw Garduza and the other individual atop a flight of stairs leading to a residence on the first floor. They ran inside, where Acosta followed and detained the men in the living room. Also, there were

two other men, a woman, and a child. Garduza and the men were taken outside while officers searched for Garduza's firearm.

¶ 11   The State published a clip of video footage captured by Acosta's body-worn camera, which we have reviewed. Acosta testified that the footage's timestamp of 5:06 was six hours fast. The video clip shows Acosta ordering men in the living room to the ground. For the remainder of the clip, Acosta searches the living room and kitchen area. According to Acosta, his camera was deactivated at 5:12:40. He did not recall precisely why, but he thought the search would be unsuccessful. Acosta later learned that officers discovered a firearm, which Acosta identified as the weapon he had seen in Garduza's possession.

¶ 12   After arresting Garduza and taking him to the station, Acosta advised him of his *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436 (1966)), which Garduza indicated he understood. About two hours later, Acosta's body-worn camera captured an interview with Garduza. Acosta lied that Garduza's fingerprints were found on the weapon. Garduza admitted that he possessed a firearm, stating he planned to fire it in the air at midnight, and, on seeing the police, ran inside and placed it next to the toilet. He further admitted being a "[r]egular soldier" of the Latin Kings gang for four years and explained his gang-related tattoos.

¶ 13   The State published the video which we have reviewed.

¶ 14   Acosta testified that he was familiar with the Latin Kings, "a criminal street organization" with over 10,000 members that committed crimes "such as racketeering, drug sales, drug manufacturing, violent crimes, and armed robberies and carjackings." Acosta gave examples of the Latin Kings' criminal activity that he had personal knowledge of. None of the examples involved Garduza. Acosta opined that Garduza belonged to the Latin Kings based on "[h]is

statement, his tattoos," and "his association to members of the gang and from information that [Acosta had] obtained through intelligence reports throughout the years."

¶ 15 On cross-examination, Acosta testified that when he and Bourdosis entered the gangway, two partners remained parked in an alley and could not have seen the front of the building where Garduza stood. Acosta acknowledged that after Garduza fled inside, he "engaged in a law enforcement-related activity" and failed to comply with a police department order to activate his body camera. He explained that his body camera was "fairly new" and he was unaccustomed to using it. Acosta described the situation as "high-stress," having just observed a person with a large magazine, making it difficult to focus on activating his camera. He said he activated his camera 5 to 10 seconds before entering the building but after about 5 minutes, it was deactivated for reasons that he stated were not "malicious." He reactivated the camera on learning that a firearm had been found, at which point he was no longer searching but "just walking through everywhere." Later that night, he activated his body camera for another call, but it did not involve "the same type of stressful environment."

¶ 16 The defense published another clip taken by Acosta's body-worn camera. He agreed it showed him activating his camera "the moment" another officer found firearms in the bathroom. This clip was not included in the record on appeal.

¶ 17 Bourdosis testified consistently with Acosta. He said he activated his body-worn camera when he entered and searched for about 12 minutes before Sergeant Juan Perez arrived. At that point he found two firearms in the bathroom hidden under a cupboard. As Bourdosis entered the bathroom, he realized his camera had deactivated and reactivated it before seeing the loaded firearm. He identified the firearm and extended magazine.

¶ 18    The State published Bourdosis's body-worn camera footage, consisting of two video clips. We have reviewed both video clips. Bourdosis tells an officer he has gloves, reaches into the hole, and removes a firearm with an extended magazine. Another officer removes a second firearm. Bourdosis leaves the bathroom and detaches the extended magazine. A bullet is visible on top of the magazine. On cross-examination, Bourdosis said the body cameras at the time had a "problem" in that the power switch "easily can just be hit on and off."

¶ 19    Chicago police sergeant Juan Perez testified that in the bathroom, he saw a panel that looked disturbed, lifted it, and saw two handguns. Perez was wearing a body camera, and the State published the footage, which we have reviewed. On cross-examination, Perez said he thought his body camera was on when he arrived and had it on just before he found the firearms.

¶ 20    The State rested after stipulating that Garduza did not have a FOID card or a CCL and was adjudicated a delinquent minor for an offense qualifying him for AUUW.

¶ 21    The trial court denied Garduza's motion for a directed finding.

¶ 22    Both parties agreed to give Illinois Pattern Jury Instructions, Criminal, No. 1.01 (approved Dec. 8, 2011), which included the instruction that the jury "should consider all the evidence in the light of [its] own observations and experience in life" and Illinois Pattern Jury Instructions, Criminal, No 1. 02 (approved Dec. 8, 2011), which instructs the jury that it is responsible for assessing the credibility of the witnesses.

¶ 23    Defense counsel indicated she had a stipulation that would impeach Acosta and Bourdosis that they alone conducted surveillance. The stipulation stated that Chicago police officer Michael Carreon told the grand jury of his participation in the surveillance and saw the two men in front of

the apartment building. He said he was near the residence and saw Garduza on the sidewalk removing a black semiautomatic handgun with a large extended magazine from his waistband.

¶ 24    The State objected that the stipulation did not constitute impeachment because Acosta and Bourdosis might not have been with Carreon when he saw the men. The court acknowledged that the State "ha[d] a point" but overruled the objection.

¶ 25    In closing arguments, defense counsel told the jury to "[g]o ahead" and conclude that Garduza belonged to the Latin Kings, a gang. Nevertheless, defense counsel argued, the State failed to prove that Garduza possessed a firearm, where the officers' testimony was incredible given their "selective recording" with body cameras.

¶ 26    The jury found Garduza guilty on all three counts.

¶ 27    The trial court denied his motion for a new trial and, after a sentencing hearing, merged AUUW counts II and V into count I for unlawful possession of a firearm by a street gang member and sentenced Garduza to 4½ years in prison.

¶ 28    We denied a petition for rehearing challenging Garduza's unsentenced convictions and asking us to rule on his ineffective assistance claims. Garduza moved for a supervisory order in the Illinois Supreme Court. The court allowed the motion and ordered this court to vacate our judgment and address Garduza's ineffective assistance claim to determine if a different result is warranted.

¶ 29                                    Analysis

¶ 30    First, Garduza argues that the State failed to prove him guilty of unlawful possession of a firearm by a street gang member.

¶ 31    Due process requires the State to prove each element of a criminal offense beyond a reasonable doubt. *People v. Murray*, 2019 IL 123289, ¶ 28. When a defendant challenges the sufficiency of the evidence, we determine whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the elements beyond a reasonable doubt. *People v. Sauls*, 2022 IL 127732, ¶ 52. We do not retry the defendant. *Id.* The factfinder resolves conflicts in testimony, weighs the evidence, and draws inferences from the facts. *Id.* We will reverse where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of guilt. *Id.*

¶ 32    Defendants commit unlawful possession of a firearm by a street gang member when knowingly possessing a firearm and ammunition outside their home or place of business without a valid FOID card and while belonging to a street gang. 720 ILCS 5/24-1.8(a)(1) (West 2018). Garduza contests that the State proved he was a member of a street gang.

¶ 33    The Illinois Streetgang Terrorism Omnibus Prevention Act (Act) (740 ILCS 147/1 *et seq.* (West 2018)) defines a gang as "any combination, confederation, alliance, network, conspiracy, understanding, or other similar conjoining *** of 3 or more persons with an established hierarchy that, through its membership or through the agency of any member engages in a course or pattern of criminal activity." *Id.* § 10. A "gang member" means (i) "any person who actually and in fact belongs to a gang" and (ii)

> "any person who knowingly acts in the capacity of an agent for or accessory to, or is legally accountable for, or voluntarily associates himself with a course or pattern of gang-related criminal activity, whether in a preparatory, executory, or cover-up phase of any activity, or who knowingly performs, aids, or abets any such activity." *Id.*

¶ 34 " '[G]ang-related' " involves

"any criminal activity, enterprise, pursuit, or undertaking directed by, ordered by, authorized by, consented to, agreed to, requested by, acquiesced in, or ratified by any gang leader, officer, or governing or policy-making person or authority, or by any agent, representative, or deputy of any such officer, person, or authority" intended to benefit the gang. *Id.*

See *Villareal*, 2023 IL 127318, ¶ 16.

¶ 35 Our supreme court held in *Villareal* that the Act's second definition of a gang member "undoubtedly" encompasses active participation in gang-related criminal activity. *Id.* ¶ 27. Villareal, also convicted under section 24-1.8(a)(1), argued that the section violated substantive due process, as it could punish "individuals with mere passive association with the gang." *Id.* ¶ 26.

¶ 36 As for the first definition of gang member—a person who " 'actually and in fact' " belongs to a gang, the court held that it referred "to a level of association beyond mere passive association." *Id.* Based on the dictionary definition of "belong," the court determined that "to belong to a gang" meant "to be attached or bound to a gang in a manner expressing an active devotion or loyalty to the gang." *Id.* ¶ 28.

¶ 37 Further, considering the Act's definitions of a gang, course or pattern of criminal activity, and gang-related criminal activity, the Act indicates that "gang members are necessarily active participants in criminal activities on behalf of the gang." *Id.* ¶ 29. The court concluded, "[F]or an individual to be prosecuted for unlawful possession of a firearm in public as a gang member, the State must prove—as an element of the offense—the individual was an active gang member at the time he possessed the firearm," rather than a "passive" member. *Id.* ¶ 31.

¶ 38 The court rejected Villareal's additional argument that the statute was void for vagueness, reiterating that "the definition of a 'gang member' requires active participation in criminal activity by an actual gang member or one acting as an agent for the gang." *Id.* ¶ 37.

¶ 39 Garduza claims the State did not prove he was an active Latin Kings member, citing *Villareal*. He acknowledges membership in the Latin Kings and does not contest that the State proved the Latin Kings are a street gang. But, he asserts, the State failed to prove he was an active member, as it never established his involvement in the gang's criminal activities.

¶ 40 The State responds that *Villareal* held only that a defendant must be an active member in the sense (i) he is not a passive or former member and (ii) the gang itself was involved in a course or pattern of criminal activity, not that the State had to prove defendant's involvement in specific gang-related criminal activity. We disagree with the State's interpretation of the court's clear language.

¶ 41 The supreme court defined an active member as a participant in the gang's criminal activity. *Id.* ¶¶ 29-30, 37 ("[G]ang members are necessarily active participants in criminal activities on behalf of the gang," legislators intended section 24-1.8(a)(1) to encompass gang members actively engaged in the gang's criminal enterprise, and "gang member" requires active participation in criminal activity or acting as an agent for the gang.).

¶ 42 Although Garduza admitted to being a Latin Kings member for four years and having the rank of "soldier" and gang-related tattoos, those admissions did not establish participation in gang-related criminal activity. Also, Acosta's testimony did not address the duties of a "soldier" or establish that soldiers participated in the criminal activity. See *id.* ¶¶ 26-31, 37 (definition of "gang

member" requires active participation in criminal activity by actual gang member or one acting as agent for gang).

¶ 43    Acosta testified that when Garduza indicated he was "busting out" in front of the building, he meant "hang out outside and represent" for the gang on weekends and holidays. Acosta's definition of "busting out" disregards the Act's definition of gang-related activity, which refers only to "*criminal*" activities, enterprises, pursuits, or undertakings intended to benefit the gang. (Emphasis added.) 740 ILCS 147/10 (West 2018); see *Murray*, 2019 IL 123289, ¶ 48 ("The Act provides that 'gang-related' means any *criminal* activity directed by any gang leader or authority" intended to benefit the gang. (Emphasis added.)). The State fails to explain how "busting out" in and of itself constitutes criminal activity or presents evidence contradicting Garduza that he possessed the firearm to shoot in the air at midnight. Nor did Acosta testify that bust-outs are typically armed, nor did the State establish that Garduza possessed the firearm for a gang-related purpose.

¶ 44    Further, the State failed to prove that Garduza voluntarily associated himself with a course or pattern of gang-related criminal activity under the Act's second definition of "gang member." See 740 ILCS 147/10 (West 2018). A course or pattern of criminal activity comprises at least two gang-related offenses committed within five years of each other, at least one of which involved a felony. *Id.* To satisfy the second definition, the defendant must voluntarily associate with a course or pattern of gang-related criminal activity "in a preparatory, executory, or cover-up phase of any activity" or knowingly perform, aid, or abet the activity. *Id.* "Associate" contemplates "in the same vein as one who acts as an agent or accessory in the planning, execution, and cover-up of a gang-

related offense" and means to join "as a partner, friend, companion, or ally in [its] preparation, execution, or cover-up." *Villareal*, 2023 IL 127318, ¶¶ 38-39.

¶ 45    Here, no evidence linked Garduza to the preparation, execution, or cover-up of two or more gang-related offenses. Although Acosta testified about examples of prior criminal activity by the Latin Kings, he did not mention any involvement by Garduza. Accordingly, the State failed to prove that Garduza voluntarily associated with a course or pattern of gang-related criminal activity.

¶ 46                    *Remand from Illinois Supreme Court*

¶ 47    Having reversed Garduza's sentenced conviction and remanded for sentencing on the AUUW counts, we did not address his claim for ineffective assistance (*Garduza*, 2024 IL App (1st) 230431-U, ¶ 44), because the notice of appeal listed only the possession/gang member conviction as the basis for the appeal. See *People v. Olaska*, 2017 IL App (2d) 150567, ¶ 115 (regardless of appellate court authority regarding unsentenced convictions, appellate court has no jurisdiction to review convictions that defendant has not in fact appealed). The supervisory order, however, directs us to vacate the judgment, so we now address the ineffective assistance of counsel claims.

¶ 48    We review a claim for ineffective assistance of counsel *de novo*. *People v. Davis*, 2023 IL App (1st) 220231, ¶ 28.

¶ 49    To establish ineffective assistance, a defendant must show that counsel's representation fell below an objective standard of reasonableness and that counsel's deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *People v. Albanese*, 104 Ill. 2d 504, 525-526 (1984). An ineffective assistance of counsel question may be resolved based only on an examination of the prejudice prong of *Strickland*. *People v. Patterson*, 2014 IL

115102, ¶ 81. "[I]f an ineffective-assistance claim can be disposed of because the defendant suffered no prejudice, we need not determine whether counsel's performance was deficient." *People v. Graham*, 206 Ill. 2d 465, 476 (2003).

¶ 50    Garduza argued that his trial counsel was ineffective by (i) failing to request a jury instruction regarding the officers' failure to activate their body-worn cameras, (ii) stipulating that Carreon had seen Garduza with a firearm, and (iii) "encouraging" the jury to find Garduza was a gang member. Garduza requests a new trial because counsel's ineffective assistance prejudiced him.

¶ 51                                          Jury Instruction

¶ 52    Garduza contends that his right to effective assistance of counsel was violated "when his attorney failed to request a jury instruction on whether officers intentionally failed to activate their cameras and, if so, to determine what weight to give that fact in evaluating their testimony."

¶ 53    The State responds that no instruction was necessary to put the jury on notice that it should consider the officers' actions in its deliberations because the jury was substantially informed through counsel's arguments, witness examination, and other jury instructions that "the officers' intermittent use of their cameras was a relevant factor in its assessment of the officers' credibility." The State also argues that Garduza was not prejudiced because, even with the instruction, the jury would not have reached a different verdict.

¶ 54    Garduza maintains counsel should have requested a jury instruction pertinent to section 10-30 of the Law Enforcement Officer-Worn Body Camera Act, which provides:

    "Evidence. The recordings may be used as evidence in any administrative, judicial, legislative, or disciplinary proceeding. If a court or other finder of fact finds by a

preponderance of the evidence that a recording was intentionally not captured, destroyed, altered, or intermittently captured in violation of this Act, then the court or other finder of fact shall consider or be instructed to consider that violation in weighing the evidence, *unless the State provides a reasonable justification*." (Emphasis added.) 50 ILCS 706/10-30 (West 2018).

¶ 55    Acosta and Bourdosis testified that their body cameras were deactivated at times and explained why. Acosta stated that the cameras were not activated during surveillance because the associated noise and light could have exposed their location. Both officers acknowledged that their cameras were not recording while driving to apprehend Garduza and as he fled into the building. Acosta further testified that he was "doing like five things at one time and it's very, very difficult to maintain those things when you're in a high-stress situation [of chasing an armed suspect]."

¶ 56    The record shows that (i) the officers testified that they are generally required to activate their body cameras during a pursuit and hadn't turned on their cameras for parts of it and (ii) defense counsel repeatedly directed the jury to focus on these failures in determining witness credibility. This establishes that the jury was adequately equipped to consider the officers' intermittent use of their body-worn cameras in assessing credibility, even though it was not explicitly instructed to do so under section 10-30. See *People v. Tompkins*, 2023 IL 127805, ¶ 56 (section 10-30 instruction unnecessary where jury told to consider evidence regarding activation of body camera in determining the weight to give police testimony).

¶ 57    Moreover, we agree with the State that any error did not affect the trial outcome due to the strong circumstantial evidence of guilt. See *People v. Mohr*, 228 Ill. 2d 53, 69 (2008) ("An error in a jury instruction is harmless if it is demonstrated that the result of the trial would not have been

different had the jury been properly instructed." (Internal quotation marks omitted.)). Not only did two police officers testify that they saw Garduza with a firearm, but Garduza admitted on a videotaped interview that he possessed the firearm and placed it behind the toilet after entering the residence.

¶ 58    Under these circumstances, we hold that a jury instruction regarding the body cameras would not have changed the outcome and, thus, Garduza was not prejudiced by counsel's inaction.

¶ 59                    Stipulation to Police Officer's Grand Jury Testimony

¶ 60    Next, Garduza argues his counsel should not have offered a stipulation that Officer Carreon told the grand jury of his participation in the surveillance and saw the two men in front of the apartment building. Defense counsel's stated justification for entering the stipulation was to impeach the two officers about who was with them on the surveillance operation.

¶ 61    Garduza maintains that in an attempt to impeach the State's witnesses, defense counsel introduced evidence that directly rebutted the entire theory of the case. According to Garduza, "absent this concession, the State failed to prove this element of the offense." Trial counsel's stated reason for offering the stipulation (to which the State objected) was that Carreon's testimony would impeach Acosta and Bourdosis's testimony that they alone conducted surveillance. Acosta testified at trial that Carreon was inside a squad car and could not see the front of the building.

¶ 62    While defense counsel's strategy for impeaching one of the State's witnesses was ultimately unsuccessful, we find the stipulation did not serve to establish an element of the offense. For example, Garduza relies on *People v. Miramontes*, where the defense theory was that the defendant did not "knowingly" possess a confiscated substance, yet the parties stipulated to its weight. *People v. Miramontes*, 2018 IL App (1st) 160410. This court reversed and ordered a new

trial, observing that stipulating to the substance's weight relieved the State of its burden to prove an essential element of the offense. *Id*. ¶ 18; see *People v. Coleman*, 2015 IL App (4th) 131045 (stipulation to contents of 15 bags of cocaine when only one tested).

¶ 63 This argument ignores Acosta's trial testimony that he and Bourdosis were watching Garduza when he saw Garduza take "a very large firearm with an extended magazine" from his waistband. Additionally, Bourdosis testified he saw Garduza holding a large firearm as he and his companion walked toward the residence.

¶ 64 Garduza cites *People v. Moore*, a case where defense counsel's multiple actions were found to have prejudiced the defendant. *People v. Moore*, 279 Ill. App. 3d 152 (1996). The *Moore* court aptly observed that "even where counsel's mistakes are egregious, we are required to examine them in the context of all of the evidence in the case to determine whether they create a reasonable probability of a different result." *Id.* at 159. "All of the evidence" in this case suggests counsel did nothing "egregious" by presenting the nontestifying officer's grand jury statement to contradict statements made by State trial witnesses.

¶ 65 Garduza also characterizes the stipulation as an "unsound strategy" that prejudiced his case, relying on *People v. Orta*, 361 Ill. App. 3d 342, 350 (2005) ("Defense counsel's repeated and misguided efforts to elicit damaging testimony not introduced by the State, and the trial judge's partial reliance on this evidence in his finding, resulted in an unfair trial for the defendant."). Again, Garduza's position ignores the trial testimony from Acosta and Bourdosis, both of whom saw Garduza on the sidewalk with "a very large firearm with an extended magazine."

¶ 66 After the supreme court ordered this court to consider Garduza's ineffective assistance claim, we allowed Garduza to cite additional authority. He asserts that *People v. Shannon*, 2024

IL App (1st) 230042, bolsters his position. In *Shannon*, the defendant was charged with unlawful possession of a weapon by a felon and stipulated that he had previously been convicted of carrying or possessing a firearm in a school. *Id.* ¶¶ 1, 5. The defendant argued that the evidence was insufficient to prove beyond a reasonable doubt that he had been convicted of a felony. *Id.* ¶ 13. *Shannon* held that "the language of a stipulation between the parties was dispositive." *Id.* ¶ 16 (citing *People v. Gray*, 2024 IL 127815, ¶ 27). Because the stipulation was conclusive " 'as to all matters necessarily included in it,' " Garduza contends that *Shannon* provides further support that stipulating to a witness's observation of Garduza with a firearm constituted ineffective assistance. *Id.* ¶ 15 (quoting *People v. Woods*, 214 Ill. 2d 455, 469 (2005)). We disagree. The facts in *Shannon* are distinguishable and its ruling on the effect of a stipulation is irrelevant. There, defense counsel's stipulation was to an element of the crime charged, *i.e.*, carrying or possessing a firearm in a school, whereas this stipulation to one police officer's grand jury testimony was merely cumulative of Acosta's and Bourdosis's testimony.

¶ 67                                    Gang Membership

¶ 68    Garduza claims that his counsel assisted the State in proving contested elements of the offense by "encouraging the jury to find Garduza was a gang member." But we have already held that the State failed to establish that Garduza voluntarily associated with a course or pattern of gang-related criminal activity:

> "Although Garduza admitted to being a Latin Kings member for four years and
> having the rank of 'soldier' and gang-related tattoos, those admissions did not establish
> participation in gang-related criminal activity. Also, Acosta's testimony did not address the

duties of a 'soldier' or establish that soldiers participated in the criminal activity." *Supra* ¶ 42.

¶ 69    Garduza's conviction for unlawful possession of a weapon by a street gang member is reversed. We remand for the imposition of sentence on the previously merged AUUW counts.

¶ 70    Reversed and remanded with directions.

---

***People v. Garduza*, 2026 IL App (1st) 230431-B**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 19-CR-1296-01; the Hon. Timothy J. Joyce, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Kara Kurland (Heidi Job, law student), of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Tasha-Marie Kelly, and Julie Riekse, Assistant State's Attorneys, of counsel), for the People. |

---